CHARLES JENKINS, ET AL., APPELLANTS, v. WILLIAM H. FAUVER, ET AL., RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued March 4, 1986—Decided April 1, 1986.

Before Judges PRESSLER, DREIER and BILDER.

*Steven E. Nelson* argued the cause for appellants (*Karasic, Stone & Susser,* attorneys; *Mr. Nelson* of counsel and on the brief).

*Catherine M. Brown,* Deputy Attorney General argued the cause for respondents Fauver, Hilton, Seidl, Moss, Ironhorn, Rafferty, Julian and Miller (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attor-

ney General, of counsel; *Arthur W. Burgess*, Director of Law; *Catherine M. Brown*, on the brief).

*Mark P. Rockwell* argued the cause for respondent Philip M. Cerria, Mayor of Woodbridge (*Franchino, Lenahan & Cross*, attorneys; *Mark P. Rockwell*, on the brief).

PER CURIAM.

Plaintiffs-appellants have appealed from administrative orders affecting their residences and status. They are 45 Rahway State Prison inmates who contend they were denied due process when they were transferred from the minimum-security Rahway Camp to residences within the adjacent main prison. Their custodial classification was changed from "full minimum" to "full minimum, inside only" or "gang minimum." Since we here determine that the change in housing did not affect a protectible interest and the reclassification of some inmates to the makeshift category of "full minimum, inside only" did not constitute an actionable deprivation, we affirm the administrative action in substantial part. We remand, however, for a determination of whether those few inmates whose status was increased to "gang minimum" were afforded the procedural safeguards provided by Department of Correction (D.O.C.) standards.

In August 1984 an inmate escaped from the Rahway Camp. On September 6, 1984 the Municipal Council of nearby Carteret demanded the resignation of the prison superintendent "by virtue of his apparent inability to protect the citizens of the Borough of Carteret." On September 23, 1984 another inmate escaped. Both had been convicted of violent crimes, one for murder. The next day the mayor of Woodbridge, another neighboring municipality, instituted legal proceedings in the Chancery Division to close Rahway Camp. Three days later an assistant commissioner of the D.O.C. directed the prison superintendent to relocate men with homicide histories or whose convictions were for crimes engendering notoriety from the

Camp to the main prison. Following meetings of the D.O.C.'s Classification Committee, 94 inmates were relocated and reclassified. Although a number were transferred with "full minimum" status within other minimum security facilities, those who have remained at Rahway under both "full minimum—inside only" and "gang minimum" status have prosecuted this appeal.

Liberty interests protected by the Fourteenth Amendment may arise from either the Due Process Clause itself or the laws of the States. *Hewitt v. Helms*, 459 *U.S.* 460, 466, 103 *S.Ct.* 864, 868–69, 74 *L.Ed.*2d 675, 685 (1983). Even state statutes and regulations governing the daily operation of prisons can give rise to a liberty interest where the language is "of an unmistakably mandatory character." *Id.* at 471, 103 *S.Ct.* at 871, 74 *L.Ed.*2d at 688. Not only can state rules create liberty interests apart from those found in the Due Process Clause, but our judicial interpretation of corresponding provisions in our State Constitution, *N.J. Const.* (1947), Art. I, ¶ I, can afford protection greater than that provided by the Federal Constitution. *See State v. Roth*, 95 *N.J.* 334, 344–345 (1984). Thus under *Avant v. Clifford*, 67 *N.J.* 496, 520–521 (1975), we must consider whether the procedures employed were "fair" and "right" in relationship to the purported deprivations. Also, under *N.J. Parole Bd. v. Byrne*, 93 *N.J.* 192, 197 (1983) we should examine the legitimacy of any expectations which the inmates may have had for continued status derived from the applicable D.O.C. Standards. We will, therefore, direct our inquiry first to the transfer of residence and next to the changes in classification.

I

Inmates do not have a protectible interest arising from the Due Process Clause alone in residing in a particular environment. In *Hewitt*, plaintiff was removed from the general

prison population and placed in "administrative segregation" [1] pending the investigation of disciplinary charges against him. The Court declared that "[i]t is plain that the transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." 459 *U.S.* at 468, 103 *S.Ct.* at 869. Nevertheless, the court found that the inmate's expectation of remaining in the general population arising from Pennsylvania statutes and regulations warranted employment of the procedural safeguards contained in those provisions.

▇ Here no reasonable expectation of housing in a less restrictive facility would arise from D.O.C. Standards. Standard 853.3c provides that:

Inmates classified as full minimum must be assigned to either: (1) work details, jobs, or programs outside the main institution, on or off institutional grounds, with minimal supervision, or (2) a satellite unit or minimum security trailer unit, or (3) both (1) and (2).

The disjunctive "or" makes unreasonable the alleged inmate expectation that if he is classified "full minimum," he must be housed in a satellite or minimum security trailer unit. The Standard could be satisfied simply by assigning the inmate to a minimally supervised work detail outside the main institution.

Even if plaintiffs had some interest in more amenable housing, such interest would be outweighed by well-founded safety concerns expressed by local communities. In view of the need for community support for many ongoing correctional programs such as work release, halfway houses, or the like, the reasonably-based sentiment of the communities surrounding a prison is a valid consideration for decisions affecting prison policies. To the extent the transfer was a manifestation of the

---

[1]That segregation was solitary confinement for nearly 24 hours a day with infrequent opportunities to shower, change clothes or exercise. 459 *U.S.* at 479 fn. 1, 103 *S.Ct.* at 875–76, fn. 1. (Blackmun, concurring in part and dissenting in part). In the present case the transfer to the main prison was not accompanied by any such deprivation of ordinary amenities.

D.O.C.'s legislative mandate to securely house inmates and was an accommodation to surrounding communities, the D.O.C. could fairly strike the balance it did between competing interests. *Mathews v. Eldridge*, 424 *U.S.* 319, 335, 96 *S.Ct.* 893, 903, 47 *L.Ed.*2d 18, 33 (1976). The summary transfer was within the "wide-ranging deference" accorded prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 *U.S.* 520, 547, 99 *S.Ct.* 1861, 1878, 60 *L.Ed.*2d 447, 474 (1979).

## II

In contrast are the changes in status which plaintiffs claim have upset more reasonable expectations and serve less discernable State interests. The D.O.C. Standards establish but three distinct levels of custody: maximum, gang minimum and full minimum. When inmates enter the institution they are classified as maximum. In accordance with intricate D.O.C. formulas relating the length of sentence and the amount of time spent in custody, inmates become "eligible for consideration" for reduced custody classification. Corresponding to each level of custody are assorted privileges allowing increased opportunities to obtain work credits toward early release and to participate in certain rehabilitation programs. *See Muhammad v. Butler*, 655 *F.Supp.* 1466, 1466–67 (D.N.J.1986). Since those inmates reclassified as "full minimum, inside only," did not lose any of the privileges associated with "full minimum" status, and the designation "inside only" simply refers to where the inmates are to be housed, we find that this reclassification did not amount to a deprivation at all, let alone a deprivation of a protectible interest.

However, those inmates reclassified as "gang minimum" were precluded from enjoying the privileges of "full minimum" status. They could have reasonably contemplated

that their status would have been retained indefinitely and not increased without conformance with ascertainable standards. As in *Hewitt*, plaintiffs' expectations were grounded in the mandatory language of a regulation. D.O.C. Standard 853.4b sets forth the sole procedures that must be followed if custody status is to be increased, and this regulation is applicable only to such changes by prison authorities other than the Classification Committee.

In an emergency situation, or when additional information is received which negatively affects an inmate's suitability to remain in reduced custody, (i.e., Parole Board decisions, escape plans, etc.) the inmate's custody level can be increased, temporarily, by order of the Superintendent, Assistant Superintendent or Director of Custody Operations. However, such changes must be reviewed and approved by the Institution Classification Committee at its next regularly scheduled meeting.

The Committee itself is governed by elaborate guidelines in reducing status, but no provision is made for its increasing an inmate's status. We reject, however, respondents' contention that this absence affords the Committee unfettered discretion since "[t]he touchstone of Due Process is freedom from arbitrary governmental action." *Ponte v. Real*, 471 *U.S.* 491, 495, 105 *S.Ct.* 2192, 2195, 85 *L.Ed.*2d 553, 558 (1985). A permanent increase in custody status is permissible only if made by the Classification Committee. If the change is temporary, Standard 853.4b may be followed to effect the status change until the next meeting of the Classification Committee; but a review of this action is required, and a permanent change must be made by the Committee. Although we have been informed by the State that there is no specific regulation generally governing the increase in status, the Committee is implicitly empowered to make such change. However, any such change in an individual's classification must be for cause and not arbitrary.[2]

---

[2]We are not here concerned with a general change in the classification system which well might be without cause relating to an individual inmate, so long as the new classifications are not arbitrary.

Since the record does not reveal whether these standards were followed, further findings are necessary to demonstrate that any change to "gang minimum" was for cause and not arbitrary.

The D.O.C. should assess the individual increases to "gang minimum" status in light of the D.O.C. disciplinary procedures outlined in *Muhammad v. Butler, supra,* requiring, prospectively, a hearing within seven days of the alleged infraction, the opportunity to call witnesses and to present documentary evidence, that any finding of guilt be based on substantial evidence and that after the hearing the inmate receive a written statement of the fact findings. 655 *F.Supp.* at 1467–68.

We remand this matter to the Commissioner of Corrections for reference to the Classification Committee. If the Committee determines that any "gang minimum" reclassification had been imposed other than for cause, it shall immediately rehear the matter. If no cause is found to have existed, the inmate shall immediately and retroactively be reclassified as "full minimum." Interim antisocial behavior, of course, may also affect the inmates' current status. We further recognize that if an inmate is to remain a Rahway resident, he may be assigned the "inside only" designation which we here determined has not adversely affected any substantial right.

The administrative actions appealed from are affirmed as to the inmates reclassified as "full minimum-inside only," and remanded in part for reconsideration in accordance with this opinion as to the inmates reclassified as "gang minimum."