CHARLES JENKINS, LLOYD MUHAMMAD, EDWARD R. WILLIAMS, JOHN KING, RA'D ABDUL-RAMIM MUHAMMAD, HENRY T. MULKA, RANDOLPH JENKINS, ABDOUR AL-RABB SHABAZZ, WYNFIELD ANDERSON, PETER SINA-CORE, DONALD PHILLIPS, JAMES TATUM, WILLIAM MOORE, EARL BENNETT, EDWARD H. BARRY, RASHEED S. ALI, EDDIE JEROME PEOPLES, II, GEORGE AWKWARD, C. GOLDIE BOONE, JERRY AMOS, RAFIZ M. SALEEM, KING WEBSTER, JOHN CHANEY, DANIEL H. RAYMOND, REHIM RASHID FARID, JOHN WHITE, HERBERT ANDREW RUCK-ER, FRED WILKS, WILLIAM GRITE, DAVID LAMBERT, LAR-RY PALMER, MICHAEL WRIGHT, MILLEGE PRIMUS, JR., DAVID BYNUM, RAUL MONSERRATE, RAYMOND THOMAS, REVEREND MARCUS C. RIGGINS, III, ANTHONY P. FLORA, QUASIM MUHAMMAD, ARTHUR TUCKER, KENDALL COO-PER, TIO SOTO, JULIAN MORALES, LOUIS MARTINEZ AND RUBIN ADAMS, RESPONDENTS AND CROSS-APPELLANTS, v. WILLIAM H. FAUVER, COMMISSIONER, NEW JERSEY DE-PARTMENT OF CORRECTIONS, GARY J. HILTON, ASSIST-ANT COMMISSIONER, NEW JERSEY DEPARTMENT OF COR-RECTIONS, RICHARD SIEDL, DEPUTY COMMISSIONER, NEW JERSEY DEPARTMENT OF CORRECTIONS, SIMEON MOSS, CHAIRMAN BOARD OF TRUSTEES, NEW JERSEY DE-PARTMENT OF CORRECTIONS, DAVID IRONHORN, CHAIR-MAN, ADVISORY COUNSEL ON CORRECTIONS, STATE OF NEW JERSEY, JOHN J. RAFFERTY, SUPERINTENDENT, NEW JERSEY STATE PRISON, RAHWAY, THOMAS JULIAN, DEPUTY CHIEF, NEW JERSEY STATE PRISON, RAHWAY, AND SGT. ROBERT MILLER, APPELLANTS AND CROSS-RE-SPONDENTS.

Argued May 4, 1987—Decided July 27, 1987.

*Catherine M. Brown,* Deputy Attorney General, argued the cause for appellants and cross-respondents (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel; *Catherine M. Brown* and *James J. Ciancia,* on the briefs).

*Steven E. Nelson* argued the cause for respondents and cross-appellants (*Karasic, Stone & Susser,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

This case concerns the emergency power of the Commissioner of Corrections (Commissioner) to supersede departmental standards permitting inmates to be assigned to "full minimum" custody status and the correlative due process rights of inmates adversely affected by the Commissioner's action.

Because of mounting public concern about the security of the minimum camp at the Rahway State Prison, an assistant commissioner of the Department of Corrections (Department) directed the Rahway State Prison superintendent to relocate all inmates with prior homicide convictions from the Rahway Camp, a satellite minimum-security correctional facility located in Woodbridge, to the main prison. Inmates were reclassified either as "full minimum—inside only," a classification not recognized by departmental standards but intended to transfer the affected inmates to cells within the main prison grounds, or to "gang minimum," a classification permitting inmates housed in the main prison to be assigned to activities or jobs on institutional grounds outside of the main facility, but within the supervisory control of corrections officials. The Appellate Division held that the transfer of inmates from full minimum custody status to the classification "full minimum—inside only" affected only their housing arrangements and did not encroach upon any protectible liberty interests of the inmates. 219 *N.J.Super.* 420, 425 (1986). However, the court determined that the reclassification of inmates to "gang minimum" must be for

cause and should be assessed by the Department by means of a fair hearing in which notice, the opportunity to call witnesses and present evidence, findings based on substantial evidence, and a written statement of reasons to inmates adversely affected would be required. *Id.* at 426.

We granted the Department's petition for certification challenging the the Appellate Division's ruling concerning the reclassification of inmates from "full minimum" to "gang minimum." 105 *N.J.* 547 (1986). We also granted the inmates' cross-petition contesting the Appellate Division's conclusion that the reclassification of inmates to "full minimum—inside only" does not violate the prisoners' due process rights. 105 *N.J.* 548 (1986). We now affirm in part and reverse in part the judgment of the Appellate Division.

I

Plaintiffs are forty-five inmates at Rahway State Prison who prior to September 1984, had been assigned full minimum custodial status. The defendants are various officials of the Department of Corrections and Rahway State Prison, as well as the mayors of Woodbridge and Carteret.[1] This action was filed in the Chancery Division seeking injunctive and monetary relief pursuant to 42 *U.S.C.* § 1983.[2]

The case was transferred to the Appellate Division on motion of the Department of Corrections, which successfully contended that defendants were appealing the final decision of a state administrative agency. On transfer, the Appellate Division

---

[1]Pursuant to a Stipulation of Dismissal filed on April 22, 1984, the claims against defendant Peter J. Sica, the mayor of Carteret, were dismissed. Although Philip Cerria, the mayor of Woodbridge, remains a party in this case, he has declined to participate in the proceedings before this Court.

[2]Initially, plaintiffs instituted an action in the United States District Court, District of New Jersey, seeking relief substantially similar to that sought in this action. The federal suit was dismissed pending resolution of these proceedings.

retained jurisdiction of the due process claims asserted in the complaint, severing damage claims for adjudication in the Law Division, and referring all other claims to the Commissioner for further proceedings should the due process issues be determined in favor of the plaintiffs. Accordingly, the sole issue considered by the Appellate Division was the adequacy of the process accorded to plaintiffs in connection with their change in custodial status.[3]

In 1984, the custodial classification of inmates was governed by Standard 853, entitled "Eligibility Criteria for Reduced Custody Consideration."[4] That standard recognized three levels of custody, the most restrictive being maximum custody, which contemplates housing of prisoners within the confines of an institution under continuous supervision. The second level, referred to as "gang minimum" or "in-and-out," authorizes assignment "to activities or jobs which routinely require [movement] outside the security of the institution, on institutional grounds, and within eyesight of a correction officer, civilian instructor or other employee * * *." Full minimum status permits an inmate to be assigned "to either (1) work details, jobs, or programs outside the main institution, on or off institutional grounds, with minimal supervision, or (2) a satellite unit or minimum security trailer unit, or (3) both (1) and (2)."

Standard 853 also sets forth eligibility criteria to determine when inmates become eligible for a custody status less restrictive than maximum custody. Before qualifying for reduced custody status, each inmate must serve a specified number of

---

[3]Plaintiffs also contend that their ability to earn commutation time through work credits was adversely affected by their reclassification, alleging that inmates assigned to the Rahway Camp work seven days per week whereas many of the inmates reassigned to the main prison are able to work only five days per week. The Attorney General disputes this contention, and we are unable to resolve the conflict on the basis of the record before us.

[4]This standard was codified at *N.J.A.C.* 10A:9–4.1 to 4.8, effective January 20, 1987. *See* 18 *N.J.R.* 1649(a) (1986), 19 *N.J.R.* 218(a) (1987).

years in maximum custody. This eligibility period is based on the length of the inmate's overall sentence and the length, if any, of the inmate's parole ineligibility term. Certain inmates, however, are ineligible for custody status less restrictive than maximum custody. Included in this category are inmates serving a sentence for a sexual offense, arson, escape, or attempted escape, who have previously been convicted as an adult for the same offense. Standard 853 does not preclude inmates with homicide convictions from being eligible for a less-restrictive custodial status.

Standard 853 authorizes the establishment of classification committees in each institution, vesting in them the sole authority to reduce or increase an inmate's custody status. Specifically, the standard provides:

> Reductions in inmates' custody levels shall be made by the Institutional Classification Committee. In an emergency situation, or when additional information is received which negatively affects an inmate's suitability to remain in reduced custody, (i.e., Parole Board decisions, escape plans, etc.) the inmate's custody level can be increased, temporarily, by order of the Superintendent, Assistant Superintendent or Director of Custody Operations. However, such changes must be reviewed and approved by the Institution Classification Committee at its next regularly scheduled meeting.

The Commissioner's action was precipitated by the escape of two inmates from the minimum security Rahway Camp in August and September 1984. The escapes prompted vigorous protests from Carteret and Woodbridge, municipalities located in the vicinity of the prison. The Carteret Municipal Council demanded the resignation of the prison superintendent, and the Mayor of Woodbridge instituted legal proceedings intended to cause the closing of the Rahway Camp. The safety concerns expressed by the municipal officials were widely reported in the media.

Responding to the public's increasing criticism about escapees from the Rahway Camp, Assistant Commissioner Hilton in September 1984 directed the Superintendent of Rahway State Prison to relocate all inmates with histories of homicide convictions from the Rahway Camp to the main prison. He also

instructed the superintendent to discontinue assignment of any such inmates to the Camp, unless the inmate had been given an actual parole release date by the parole board and until a so-called infra-red security system had been installed. All inmates who were relocated were reclassified as "full minimum—inside only," a makeshift classification intended to affect only the housing condition of the inmates and not their work assignments, or "gang minimum," a classification affecting both housing and work assignments.

The Rahway Prison classification committee held abbreviated hearings over a period of several days following the assistant commissioner's directive. The record does not reveal the procedure followed at the hearings. Presumably, the classification committee was primarily concerned with verifying that the inmates being reclassified had prior convictions for homicide. Although a number of inmates were reassigned to other state correctional facilities, plaintiffs were retained at Rahway Prison in either "full minimum—inside only" or gang minimum status.

As noted above, the Appellate Division upheld the reclassification of inmates to "full minimum—inside only," but reversed the reclassification of inmates to gang minimum, remanding that matter to the Department for reconsideration after an adequate hearing. 219 *N.J.Super.* at 427.

## II

At the outset we acknowledge the principle, established by a series of Supreme Court decisions beginning with *Morrissey v. Brewer*, 408 *U.S.* 471, 92 *S.Ct.* 2593, 33 *L.Ed.*2d 484 (1972), that certain rights and interests of prisoners in state correctional institutions are protected by the due process clause of the federal constitution:

There is no iron curtain drawn between the Constitution and the prisons of this country. Prisoners have been held to enjoy substantial religious freedom under the First and Fourteenth Amendments. They retain right of access to the courts. Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race. Prisoners may also claim the protections of the Due Process Clause. They may not be

deprived of life, liberty, or property without due process of law. [*Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 *S.Ct.* 2963, 2974, 41 *L.Ed.*2d 935, 950–51 (1974) (citations omitted).]

*See also New Jersey Parole Bd. v. Byrne*, 93 *N.J.* 192, 199 (1983) (holding that "loss of a full step reduction in parole eligibility time 'implicates a liberty interest that is protected by the Due Process Clause' of the federal Constitution"); *Avant v. Clifford*, 67 *N.J.* 496, 525 (1975) (recognizing an extra-constitutional "fairness and rightness" standard for testing validity of prison disciplinary procedures).

In *Vitek v. Jones*, 445 U.S. 480, 100 *S.Ct.* 1254, 63 *L.Ed.*2d 552 (1980), Justice White summarized the Court's major decisions involving the due process rights of prisoners:

There is no "constitutional or inherent right" to parole, *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7 [99 *S.Ct.* 2100, 2103–2104], 60 *L.Ed.*2d 668 (1979), but once a State grants a prisoner the conditional liberty properly dependent on the observance of special parole restrictions, due process protections attach to the decision to revoke parole. *Morrissey v. Brewer*, 408 U.S. 471, 92 *S.Ct.* 2593, 33 *L.Ed.*2d 484 (1972). The same is true of the revocation of probation. [Citation.] In *Wolff v. McDonnell*, 418 U.S. 539, 94 *S.Ct.* 2963, 41 *L.Ed.*2d 935, 71 *Ohio* Ops 2d 336 (1974), we held that a state-created right to good-time credits, which could be forfeited only for serious misbehavior, constituted a liberty interest protected by the Due Process Clause. We also noted that the same reasoning could justify extension of due process protections to a decision to impose "solitary" confinement because "[it] represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct." [Citation]. Once a State has granted prisoners a liberty interest, we held that due process protections are necessary "to insure that the state-created right is not arbitrarily abrogated." [Citation].

In *Meachum v. Fano*, 427 U.S. 215, 96 *S.Ct.* 2532, 49 *L.Ed.*2d 451 (1976), and *Montanye v. Haymes*, 427 U.S. 236, 96 *S.Ct.* 2543, 49 *L.Ed.*2d 466 (1976), we held that the transfer of a prisoner from one prison to another does not infringe a protected liberty interest. But in those cases transfers were discretionary with the prison authorities, and in neither case did the prisoner possess any right or justifiable expectation that he would not be transferred except for misbehavior or upon the occurrence of other specified events. Hence, "the predicate for invoking the protection of the Fourteenth Amendment as construed and applied in *Wolff v. McDonnell* [was] totally nonexistent." [Citation].

Following *Meachum v. Fano* and *Montanye v. Haymes*, we continued to recognize that state statutes may grant prisoners liberty interests that invoke due process protections when prisoners are transferred to solitary confinement

for disciplinary or administrative reasons. *Enomoto v. Wright,* 434 *U.S.* 1052, 98 *S.Ct.* 1223, 55 *L.Ed.*2d 756 (1978), summarily affg 462 *F.Supp.* 397 (N.D.Cal. 1976). Similarly, in *Greenholtz v. Nebraska Penal Inmates,* supra, we held that state law granted petitioners a sufficient expectancy of parole to entitle them to some measure of constitutional protection with respect to parole decisions. [445 *U.S.* at 488–89, 100 *S.Ct.* at 1261, 63 *L.Ed.*2d at 562.]

*See also New Jersey Parole Bd. v. Byrne, supra,* 93 *N.J.* at 199–200 (quoting *Vitek v. Jones, supra,* 445 *U.S.* at 488–89, 100 *S.Ct.* at 1261, 63 *L.Ed.*2d at 562).

Although the Court's decisions resolving prisoner due process claims are frequently fact-sensitive, certain principles are readily discernible from the cases. The Court has generally declined to recognize a liberty interest warranting due-process protection where the prisoner's status was subject to change by authorities without any proof of misconduct. *See Meachum v. Fano,* 427 *U.S.* 215, 96 *S.Ct.* 2532, 49 *L.Ed.*2d 451 (1976). However, where the interest the prisoner seeks to protect can be affected only for misconduct, the Court has usually acknowledged the existence of a liberty interest entitled to appropriate due-process protection. *See Wolff v. McDonnell,* 418 *U.S.* 539, 94 *S.Ct.* 2963, 41 *L.Ed.*2d 935 (1974).

In *Wolff, supra,* the complaint challenged the disciplinary procedures of a Nebraska prison that could result in the withholding of good-time credits, thereby affecting a prisoner's release date from prison. Specifically, the inmates contended that since good-time credits could be withheld only because of serious misconduct, the abbreviated hearing procedures afforded by the prison officials violated their due process rights. The Court agreed, and required at a minimum that the prisoners be accorded advance written notice of the disciplinary proceedings, the opportunity to call witnesses and present documentary evidence, and a written statement of reasons for any disciplinary action. 418 *U.S.* at 563–67, 94 *S.Ct.* at 2978–80, 41 *L.Ed.* 2d at 955–57. The Court reasoned that

the fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed. Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of

rights due a defendant in such proceedings does not apply. In sum, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application. * * * It is true that the Constitution itself does not guarantee good time credit for satisfactory behavior while in prison. But here the State itself has not only provided a statutory right to good-time but also specifies that it is to be forfeited only for serious misbehavior. Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest." But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated. [418 *U.S.* at 556–57, 94 *S.Ct.* at 2975, 41 *L.Ed.*2d at 950–51 (citations omitted).]

In comparison, both *Montanye v. Haymes,* 427 *U.S.* 236, 96 *S.Ct.* 2543, 49 *L.Ed.*2d 466 (1976), and *Meachum v. Fano,* 427 *U.S.* 215, 96 *S.Ct.* 2532, 49 *L.Ed.*2d 451 (1976), involved claims that prisoners' liberty interests were violated by the transfer of prisoners from one institution to another within the same state. In *Montanye,* an inmate at the Attica Correctional Facility, a maximum security facility in New York State, was transferred to Clinton Correctional Facility, another maximum security prison, after prison officials seized a petition addressed to a federal judge complaining of the inmate's removal as the prison's law-library clerk. In *Meachum,* inmates at a Massachusetts medium security institution, suspected of starting fires at the prison, were transferred to other state prisons, one of which was a maximum security institution. The Court's opinion in *Meachum* reflected its rationale in both cases:

Here, Massachusetts law conferred no right on the prisoner to remain in the prison to which he was initially assigned, defeasible only upon proof of specific acts of misconduct. Insofar as we are advised, transfers between Massachusetts prisons are not conditioned upon the occurrence of specified events. On the contrary, transfer in a wide variety of circumstances is vested in prison officials. The predicate for invoking the protection of the Fourteenth Amendment as construed and applied in *Wolff v McDonnell* is totally nonexistent in this case.

     *       *       *       *       *       *       *       *

As we understand it no legal interest or right of these respondents under Massachusetts law would have been violated by their transfer whether or not their misconduct had been proved in accordance with procedures that might be required by the Due Process Clause in other circumstances. Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all. [427 *U.S.* at 226–28, 96 *S.Ct.* at 2539–40, 49 *L.Ed.*2d at 460–61 (footnote omitted).]

Similarly, in *Hewitt v. Helms*, 459 *U.S.* 460, 103 *S.Ct.* 864, 74 *L.Ed.*2d 675 (1983), an inmate sought due process protection when he was confined to administrative segregation because of his involvement in a prison riot. Observing that administrative segregation "may be used to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer," the Court noted that administrative segregation is "the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." 459 *U.S.* at 468, 103 *S.Ct.* at 869, 74 *L.Ed.*2d at 686. Accordingly, the Court held that a constitutionally-based liberty interest was not necessarily implicated by an assignment to administrative segregation. *Id.* at 467, 103 *S.Ct.* at 869, 74 *L.Ed.*2d at 685. However, because the Pennsylvania statutes at issue in *Hewitt* imposed mandatory requirements conditioning the imposition of administrative segregation in its prisons, the Court concluded that the State had created a liberty interest, *id.* at 472, 103 *S.Ct.* at 871, 74 *L.Ed.*2d at 688, but that the procedures followed were consistent with due process requirements. *Id.* at 477, 103 *S.Ct.* at 874, 74 *L.Ed.*2d at 691.

The distinction between a dilution of prisoner rights based on individualized rather than institutional factors is well-illustrated by *Tracy v. Salamack*, 572 *F.*2d 393 (2d Cir.1978). In that case, inmates in the New York State Correctional System challenged their removal from a temporary release program previously available to all inmates within one year of their parole eligibility. Plaintiffs had received approval to participate in the program and some had commenced participation.

The underlying statute was amended in 1977 to preclude participation in the temporary release program by inmates under sentence for specified violent crimes, without the written approval of the Commissioner of Corrections. After a screening process, 140 inmates were removed from the program. The District Court concluded that the due-process clause protected the inmates against removal without a prior hearing, and further ordered that none of the inmates could be removed from the program unless a change of facts had occurred since the original determination permitting the inmates' participation. *Tracy v. Salamack*, 440 *F.Supp.* 930, 936–37 (S.D.N.Y.1977).

The Second Circuit Court of Appeals held, however, that the prisoners' rights could be modified by a statutory change, observing that although an interest "rooted in state law may well require an individualized procedural due process hearing before it may be revoked," it does not necessarily "have the substantive effect of prohibiting alteration of the underlying law which creates the entitlement." *Tracy v. Salamack, supra*, 572 *F.*2d at 396. The court concluded that the due process hearing to which the inmates were entitled required a re-evaluation by the Commissioner "of each participating inmate's eligibility in the light of the threat that the inmate presents to the security of the community, taking into account his eligibility for parole, his past institutional record, the particular circumstances underlying the violent offense for which he is under sentence, and his previous temporary release record." *Id.* at 397.

The decision in the *Salamack* case is significant for two reasons. First, it emphasizes that when the underlying standards affecting prisoners are modified by statute, without regard to the prisoners' specific conduct, no due-process rights are implicated. Second, the decision emphasizes that to the extent the prisoner's individualized record is to be considered in the decision granting or denying admission to the release program, the due-process clause guarantees that the prisoner receive a fair hearing.

### III

The record in this case makes it unmistakably clear that the change in the custody status of these prisoners was prompted solely by security concerns voiced by officials of neighboring municipalities and not at all by allegations of individualized misconduct. The uncontradicted affidavit of Assistant Commissioner Hilton verifies that two escapes by convicts convicted of homicide and the attendant outcry from officials in Woodbridge and Carteret motivated the departmental action at issue here. The change in policy affected all inmates convicted of homicide who had been assigned to full minimum status, and their reclassification to gang minimum or the makeshift category of "full minimum—inside only," was unrelated to their disciplinary record at Rahway Prison.

We have no doubt, in view of the strained relationship between Rahway Prison and the neighboring municipalities—manifested by litigation, a resolution seeking the superintendent's resignation, and adverse publicity—that the Commissioner, acting through his assistant, was empowered to reclassify Rahway Camp inmates whose records reflected convictions of homicide. The Legislature has vested in the Commissioner broad discretionary powers to administer the Department, including authority to "[d]etermine all matters of policy and regulate the administration of the institutions * * * within his jurisdiction * * *." *N.J.S.A.* 30:1B–6. *See Gibson v. Lynch,* 652 *F.*2d 348, 355 (3d Cir.1981), *cert.* denied *sub nom. Stanley v. Zimmerman,* 462 *U.S.* 1137, 103 *S.Ct.* 3123, 77 *L.Ed.*2d 1375 (1983). He is specifically empowered to designate places of confinement for inmates, *N.J.S.A.* 30:4–91.1, and to transfer inmates from one institution to another, *N.J.S.A.* 30:4–85. Unquestionably, his overall responsibility for administering the Department and its facilities encompasses a duty to take appropriate action to preserve satisfactory relationships with municipalities affected by the proximity of state penal institutions. As the Appellate Division perceptively observed:

In view of the need for community support for many ongoing correctional programs such as work release, halfway houses, or the like, the reasonably-based sentiment of the communities surrounding a prison is a valid consideration for decisions affecting prison policies. To the extent the transfer was a manifestation of the D.O.C.'s legislative mandate to securely house inmates and was an accommodation to surrounding communities, the D.O.C. could fairly strike the balance it did between competing interests. *Mathews v. Eldridge*, 424 *U.S.* 319, 335, [96 *S.Ct.* 893, 903] 47 *L.Ed.*2d 18, 33. The summary transfer was within the "wide-ranging deference" accorded prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547, 99 *S.Ct.* 1861, [1878] 60 *L.Ed.*2d 447, 474 (1979). [219 *N.J.Super.* at 425.]

■ Although we conclude that the Commissioner's emergent action was warranted because of the hostile relationship that developed between Rahway Prison and its neighboring municipalities, we do not intend to minimize the significant impact of the reclassification on the affected inmates. Undoubtedly, the inmates were fully justified in preferring assignment to the Rahway Camp over assignment to the main prison, in view of the less restrictive conditions of confinement. The inmates might also have assumed that in the normal course of events, and absent misconduct on their part, their assignment to the Camp would not be rescinded. But precisely because of the unique circumstances that attend the administration of prisons, reasonable assumptions of inmates cannot always be equated with constitutionally-protected liberty interests. Under the circumstances presented by this record, we are satisfied that the removal of inmates with prior homicide convictions from the Rahway Camp and their reclassification to more restrictive custodial categories was an appropriate exercise of the Commissioner's authority as administrator and chief executive officer of the Department. *See N.J.S.A.* 30:1B–6.

■■ Since the Commissioner had authority to reclassify the prisoners at the Rahway Camp with prior homicide convictions, and since he did so without regard to their individualized

disciplinary records, it is clear that no liberty interest of the inmates was implicated by his action. *See Montanye v. Haymes, supra,* 427 *U.S.* 236, 96 *S.Ct.* 2543, 49 *L.Ed.*2d 466; *Meachum v. Fano, supra,* 427 *U.S.* 215, 96 *S.Ct.* 2532, 49 *L.Ed.* 2d 451; *see also Hluchan v. Fauver,* 480 *F.Supp.* 103 (D.N.J. 1979) (holding that New Jersey sex offender inmate, excluded from minimum custody status by departmental standards, has no liberty interest in denial of less restrictive classification). Nor would any useful purpose have been served by an expansive hearing since the only issue to be resolved was whether the particular inmate's record reflected a prior conviction for homicide. In this context, the review by the Institutional Classification Committee of increases in an inmate's custody level, provided for in the Department's Standard 853, would be superfluous. Although the record is not enlightening, we assume that the abbreviated review afforded these inmates by the Classification Committee satisfactorily verified that they were indeed subject to the Commissioner's reclassification decision. In our view, no relevant purpose would be served by affording these inmates the more comprehensive procedures contemplated by *Wolff v. McDonnell, supra,* 418 *U.S.* at 563–67, 94 *S.Ct.* at 2978–80, 41 *L.Ed.*2d at 955–57.

■ Finally, we must observe that the Commissioner's administrative action in this matter, although unquestionably valid when taken, is inconsistent with the departmental regulations establishing categories of inmates excluded from eligibility for custodial status less restrictive than maximum security. *See N.J.A.C.* 10A:9–4.8. As noted, those regulations exclude only certain sex offenders, arsonists, and escapees from the less-restrictive custodial classifications. Our attention has not been directed to any amendment or proposed amendment to the applicable regulations concerning inmates with homicide convictions. Accordingly, we assume that the current regulations do not provide for a distinction between inmates with homicide

convictions and other inmates in determining eligibility for less-restrictive custodial classifications.

■  Since the Commissioner has already used rule-making to establish eligibility standards for custodial classifications, it requires no extended discussion to demonstrate that the subject matter is one that is readily adaptable to the regulatory process.  In view of our conclusion that in appropriate circumstances the Commissioner possesses the residual authority to supersede the custodial classification standards, it follows that the criteria for exercising that authority would best be articulated by departmental regulation, adopted after notice and the opportunity for public comment.  *See generally Metromedia Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 331–32 (setting forth relevant factors to determine whether agency action should be rendered through rule-making or adjudication).  The necessity for emergent action taken to resolve the hostilities between Rahway Prison and its neighboring communities has passed.  The Department should now reconcile its action with the regulations governing the classification of prisoners.

We noted in *Metromedia, supra,* some of the significant procedural and substantive features inherent in the rule-making process:

> The procedural requirements for the passage of rules are related to the underlying need for general fairness and decisional soundness that should surround the ultimate agency determination. These procedures call for public notice of the anticipated action, broad participation of interested persons, presentation of the views of the public, the receipt of general relevant information, the admission of evidence without regard to conventional rules of evidential admissibility, and the opportunity for continuing comment on the proposed agency action before a final determination. [97 *N.J.* at 331.]

In the process of adopting a regulation that harmonizes the custodial classification standards with the Commissioner's residual authority, these attributes of rule-making would undoubtedly serve the interests of both the Department and the inmate population.  *Cf. Avant v. Clifford, supra,* 67 *N.J.* at 564 (Conford, J., concurring) (endorsing value of public commentary

prior to adoption or amendment of prison rules and regulations).[5]

To summarize, we hold that the Commissioner's non-individualized reclassification of Rahway Camp inmates with prior homicide convictions from "full minimum" to either "full minimum—inside only" or "gang minimum" did not implicate the prisoners' federally-protected liberty interests or require a more elaborate due-process type hearing as described in *Wolff v. McDonnell, supra.* Our holding anticipates that the Commissioner will promptly take action leading to the adoption of amendments to the departmental regulations that would reconcile such regulations with the reclassification that we sustain today. Accordingly, we affirm in part and reverse in part the judgment of the Appellate Division.

*For affirmance in part and reversal in part* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, STEIN O'HERN and GARIBALDI—7.

*Opposed* —None.

---

[5]As originally enacted, the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –15, exempted from its provisions agencies responsible for the operation of penal and correctional institutions. *L.*1968, *c.* 410, § 2. That exemption has since been repealed. *L.*1981, *c.* 27, § 10.