**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3752-19

NAKEEM BROWN,

     Appellant,

v.

NEW JERSEY DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____

Submitted October 6, 2021 – Decided October 25, 2021

Before Judges Gilson and Gooden Brown.

On appeal from the New Jersey Department of Corrections.

Nakeem Brown, appellant pro se.

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Chanell Branch, Deputy Attorney General, on the brief).

PER CURIAM

Nakeem Brown, an inmate at Northern State Prison, appeals from an April 17, 2020 final agency decision of the New Jersey Department of Corrections (DOC). The DOC upheld a disciplinary hearing officer's finding of guilt and imposition of sanctions for Brown's commission of prohibited acts *.012, "throwing bodily fluid at any person"; *.259, "failure to comply with an order to submit a specimen for prohibited substance testing"; and .210 "possession of anything not authorized for retention or receipt by an inmate or not issued to him . . . through regular correctional facility channels,"[1] in violation of N.J.A.C. 10A:4-4.1.[2] We affirm.

We glean these facts from the record. On March 11, 2020, after an officer reported observing Brown in his cell "rolling what appeared to be a homemade cigarette with a green leafy substance," several officers responded to the unit for further investigation and observed Brown "stuff[ing] something in his pants." During a pat frisk, an officer discovered "a rolled[-]up piece of paper with a

---

[1] The original charge *.203, "possession or introduction of any prohibited substances, such as drugs, intoxicants, or related paraphernalia not prescribed for the inmate by the medical or dental staff," was reduced to the .210 charge.

[2] Under N.J.A.C. 10A:4-4.1(a), an inmate who commits a prohibited act "shall be subject to disciplinary action and a sanction . . . imposed by a Disciplinary Hearing Officer [(DHO)]." "Prohibited acts preceded by an asterisk (*) are considered the most serious and result in the most severe sanctions . . . ." Ibid.

green leafy substance" in Brown's waistband. A "burnt soap pad" and pieces of "altered wires" apparently "used to light up the rolled[-]up paper" were also found on the floor in the immediate vicinity. As a result, Brown was escorted from the unit "to be [s]trip searched for any further contraband and to provide a urine specimen."

While providing the urine sample in the bathroom under the supervision of Officer DiMichele, Brown threw his urine at DiMichele, "striking him on the right leg over his pants." A "Code 33"[3] was called, OC spray[4] was deployed, and Brown was eventually "secured in handcuffs" after a physical altercation with the officers, during which Brown sustained "minor cuts to the bridge of his nose, swelling to the back of his head and tenderness by the right side of his ribs." One other officer sustained minor injuries. The officers reportedly used force because Brown refused to comply with verbal orders and was "combative and assaultive towards . . . staff." Brown was later charged with the disciplinary infractions that are the subject of this appeal.

---

[3] A Code 33 alerts DOC staff of an emergency within the prison and signals all available staff to respond to the situation.

[4] "'OC spray,' [is] a chemical agent." Mejia v. N.J. Dep't of Corr., 446 N.J. Super. 369, 372 (App. Div. 2016).

At the ensuing disciplinary hearing, Brown requested and was granted the assistance of counsel substitute and pleaded not guilty to the charges. Brown also requested video of the unit where the incident occurred but was informed there was no video of the bathroom area. Additionally, Brown requested to confront and cross-examine DiMichele, which request was granted. Brown posed seven questions, which DiMichele answered as follows:

> 1. Did you file an injury report on the day of the alleged incident?
>
> "No I didn't. I was splashed, not injured [and] there was a [forty] minute wait in clinic [and] I had work to do. I left."
>
> 2. Were you seen by medical staff here?
>
> "No."
>
> 3. Did you go home for the day?
>
> "I left [at] end of shift when I finished writing up my paperwork."
>
> 4. What is the standard procedure when bodily fluids such as urine are thrown on you?
>
> "It never happened to me before, I didn't know so I went to medical but the wait was too long."
>
> 5. Did you take any photos of the area of your lower body (pants) where you stated the [half] cup of urine was thrown on you?

4

"There were no photos taken."

6. Did you preserve any physical evidence knowing that an institutional charge would be pending, such as the urine cup?

"No I didn't. I don't know if anyone else did."

7. Did any other officer witness inmate Brown throw urine on you?

"No. I was there alone [with] him."

Thereafter, Brown requested DiMichele answer the following seven follow-up questions:

1. Were you in the bathroom when the OC spray was administered?

2. What was the reason for the [forty] minute wait at medical?

3. Did any of your supervisors advise you on the procedures of what to do when you have bodily fluids thrown on you?

4. Did you suffer any scrapes or bruises during the scuffle with inmate Brown?

5. Was the article of clothing you were wearing (pants) preserved for evidence so that the fluid can be tested?

6. Were you ever interviewed by anyone (RN) here at medical?

5

> 7. Did you have to decontaminate yourself of the mace/OC spray since you were in direct proximity when it was administered?

When the follow-up questions were propounded, DiMichele was "out of work . . . due to the COVID-19 outbreak" and therefore "unavailable to confront." After considering the questions DiMichele had previously answered, as well as his written statement,[5] the DHO denied the request, determining the follow-up questions would "likely . . . produce repetitive testimony."

Following the hearing, the DHO found Brown guilty of the charges and determined Brown "was afforded all due process." In reaching the decision, the DHO reviewed all the evidence, including numerous incident reports, DiMichele's statement and confrontation questions, as well as Brown's statement denying the charges and Brown's claim that he was attacked by the officers. The DHO imposed aggregate sanctions of 181 days' administrative segregation, 100 days' loss of commutation time, thirty days' loss of canteen privileges, and thirty days' loss of recreational privileges. To support the sanctions, the DHO reasoned Brown "continues to accrue charges," "takes no responsibility for his behavior," and "needs to follow rules [and] consider the safety of others."

---

[5] In his statement, DiMichele reported "[he] was ordered to void . . . Brown." When "Brown was unable to provide a substantial amount of urine," "he became irate and threw the urine at [him] hitting [him] on the lower half of [his] body."

Brown filed an administrative appeal, arguing the DHO "violated all procedural safeguards" and "the finding of guilt was not supported by substantial evidence." Further, Brown asserted "[t]here were serious issues of credibility," and evidence of "a cover-up," manifested by "fabricated charges . . . issued to support an unwarranted use-of-force." Brown urged that "the charges be rescinded" or "the sanctions be modified and/or suspended." On April 17, 2020, a DOC assistant superintendent rejected Brown's contentions and upheld the guilty finding and sanctions imposed. This appeal followed.

On appeal, Brown argues the decision was "arbitrary, capricious, and unreasonable[,] and disregarded the record." Brown renews his contention that instead of supporting the charges, "the record clearly showed [he] was attacked" and reports were "falsified . . . to justify [u]se of [f]orce."

Our role in reviewing a prisoner disciplinary decision is limited. Figueroa v. N.J. Dep't of Corr., 414 N.J. Super. 186, 190 (App. Div. 2010). Generally, the decision must not be disturbed on appeal unless it was arbitrary, capricious or unreasonable, or lacked the support of "substantial credible evidence in the record as a whole." Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980). See also N.J.A.C. 10A:4-9.15(a) ("A finding of guilt at a disciplinary hearing

shall be based upon substantial evidence that the inmate has committed a prohibited act.").

"'Substantial evidence' means 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Figueroa, 414 N.J. Super. at 192 (quoting In re Pub. Serv. Elec. & Gas Co., 35 N.J. 358, 376 (1961)). In that regard, while we accord deference to the agency, "we will not perfunctorily review and rubber stamp the agency's decision," Balagun v. N.J. Dep't of Corr., 361 N.J. Super. 199, 203 (App. Div. 2003), and we must "engage in a 'careful and principled consideration of the agency record and findings,'" Williams v. Dep't of Corr., 330 N.J. Super. 197, 204 (App. Div. 2000) (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)).

When reviewing a prison disciplinary matter, we also consider whether the DOC followed the regulations adopted to afford inmates procedural due process. See McDonald v. Pinchak, 139 N.J. 188, 194-95 (1995); Jacobs v. Stephens, 139 N.J. 212, 220-22 (1995). Admittedly, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due [to] a defendant in such proceedings does not apply." Jenkins v. Fauver, 108 N.J. 239, 248-49 (1987) (quoting Wolff v. McDonnell, 418 U.S. 539, 556 (1974)).

However, the inmate's more limited procedural rights, initially set forth in Avant v. Clifford, 67 N.J. 496, 525-46 (1975), are codified in a comprehensive set of DOC regulations. N.J.A.C. 10A:4-9.1 to -9.28. Those rights include an inmate's entitlement to a limited right to confront and cross-examine adverse witnesses, N.J.A.C. 10A:4-9.14, and, in certain circumstances, the assistance of counsel substitute, N.J.A.C. 10A:4-9.12. These regulations "strike the proper balance between the security concerns of the prison, the need for swift and fair discipline, and the due-process rights of the inmates." Williams, 330 N.J. Super. at 203 (citing McDonald, 139 N.J. at 202).

Applying these principles, we are satisfied there was substantial credible evidence in the record to support the finding of guilt, and Brown received all the procedural due process to which he was entitled. Brown asserts the DHO ignored "[t]he fact that . . . DiMichele lied during confrontation" and seems to suggest the DOC withheld exculpatory video footage of the incident. Neither claim is supported by the record.[6] In addition, the sanctions imposed were

---

[6] We are also satisfied the DHO's decision pertaining to Brown's follow-up cross examination questions was reasonable. See Negron v. N.J. Dep't of Corr., 220 N.J. Super. 425, 430 (App. Div. 1987) ("The hearing officer is given broad discretion to refuse a request for cross-examination and confrontation . . . .") (citing N.J.A.C. 10A:4-9.14(a)).

commensurate with the severity of the infractions and authorized under N.J.A.C. 10A:4-5.1 for asterisk offenses.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3752-19