Neil HUNTERSON, Petitioner,

v.

Mary Keating DiSABATO, Chairperson, New Jersey State Parole Board, et al., Respondents.

No. CIV. A. 98–482.

United States District Court, D. New Jersey.

Sept. 10, 1998.

Opinion on Reconsideration June 10, 1999.

John Stuart Furlong, Furlong & Krasny, West Trenton, NJ, for Petitioner.

Daniel F. Dryzga, Jr., Office of NJ Attorney General, Trenton, NJ, for Respondents.

## ORDER

RODRIGUEZ, District Judge.

This matter is before the court on motion of *pro se* Petitioner, Neil Hunterson, for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner also filed a motion to compel discovery. The Court, after considering the submission of the parties, and for the reasons set forth below, grants the petition and dismisses the motion to compel discovery as moot.

## *BACKGROUND*

### A. *Factual and Procedural History*

Petitioner Neil "Dutch" Hunterson was originally convicted of murder and kidnaping in the Superior Court of New Jersey, Camden County on July 28, 1972. He was paroled on July 29, 1992, after serving approximately twenty years of a life sentence. Over two years later, Petitioner was rearrested and imprisoned on minor drug charges, beginning his struggle through a long and complex procedural morass that Petitioner alleges to be the result of retaliatory motives of the New Jersey Bureau of Parole designed to keep him imprisoned despite having properly completed his prison sentence. Specifically, Petitioner argues that his confinement is retaliation by the New Jersey Department of Corrections ("DOC") for both his personal relationship with Deborah Hansen, the former Deputy Director of Interstate Parole Services, and their public statements criticizing the DOC for their handling of the Robert "Mudman" Simon case.[1] According to the petition and vari-

---

1. Robert "Mudman" Simon, a member of the Warlocks motorcycle gang, was convicted of murder. After being paroled from a Pennsyl-

ous newspaper articles written about the couple, copies of which were included as exhibits to the petition, Hansen was suspended from her job when the Bureau of Parole learned of their relationship. It was felt that this type of relationship created a conflict of interest.

From Petitioner's version of the facts,[2] it appears that the New Jersey Department of Corrections Bureau of Parole first learned about their relationship sometime in the first half of 1994. From that point on, he claims the DOC conspired to destroy the relationship and terminate Hansen's employment.[3] To further punish her, Petitioner claims that the Bureau of Parole attempted to revoke Petitioner's parole based on an old marijuana possession charge. *See, e.g.,* Larry King and Maureen Graham, *The Biker and the bureaucrat,* THE PHILADELPHIA INQUIRER, June 18, 1995; Pet'r's Ex. 35.

The events most relevant to this petition began on September 29, 1994, when Petitioner, while released on parole, was rearrested on charges of possession of marijuana and possession with intent to distribute approximately fifty grams of marijuana. He was released on his own recognizance. On October 3, 1994, when Petitioner reported to his parole office as directed, he was arrested on a parole violator warrant based on urine specimens that allegedly tested positive for controlled substances. The Bureau of Parole then filed a notice of probable cause hearing with the New Jer-

sey Parole Board ("Board") based on the allegedly tainted urine specimens.

Probable cause for the parole violator warrant was found at a hearing held on October 21, 1994, and Petitioner was ordered to be held pending final revocation proceedings. On October 27, 1994, while Petitioner was waiting for his appeal to the Appellate Division of the New Jersey Superior Court to be heard, a supplemental Notice of Probable Cause Hearing was filed, based on both the marijuana arrest and tainted urine samples. The original parole violator warrant, however, was found to be without probable cause by the Appellate Division on November 2, 1994 and the three urine samples were suppressed because the State could not establish the proper chain of custody.[4] A third Notice of Probable Cause Hearing was issued on November 4, 1994, again referencing the marijuana charge. On November 15, 1994, Petitioner received a letter stating that the Probable Cause Hearing was indefinitely postponed pending the outcome of Petitioner's marijuana charge and Petitioner was released. Letter to Pet'r dated 11/15/95; Pet'r's Ex. 24. Also sometime in November, 1994, the possession with intent to distribute charge was dropped, but Petitioner was indicted on one count of possession of 51.1 grams of marijuana, a fourth degree offense. On December 27, 1994, the second parole vio-

vania prison, New Jersey parole officials agreed to allow him to relocate to Williamstown, New Jersey, an area apparently known for Warlock activity. While on parole in New Jersey, Mudman shot and killed a Franklin Township Police Officer, sparking controversy regarding the decision of the New Jersey Parole Board to accept him despite his record of violence and gang affiliations.

2. Along with his Memorandum of Law, Petitioner submitted volumes of documentary exhibits from every stage of the proceedings.

3. He alleges that on May 17, 1994, Hansen was suspended from her position and administrative actions were commenced against her.

4. The Appellate Division stated:

In view of the State's representation that it cannot establish the chain of custody of the three urine tests, the finding of probable cause of October 21, 1994 is reversed.

*Hunterson v. New Jersey State Parole Board,* (App.Div., Nov. 2, 1994); Pet'r's Ex. 12.

lator warrant was vacated by the Appellate Division.[5]

Still prior to any adjudication on the possession of marijuana charge and approximately eight months later, on June 15, 1995 a third Probable Cause Hearing was conducted. Probable cause was found, but after another emergent appeal to the Appellate Division, this warrant was also vacated for lack of probable cause.[6] Accordingly, on June 20, 1995, Petitioner was again ordered to be released.

The New Jersey Supreme Court, however, stayed the order releasing petitioner and allowed the Chief of the New Jersey Bureau of Parole to reapply to the Parole Board for accelerated revocation proceedings. On June 28, 1995, just two days later, the Bureau of Parole filed another Notice of Probable Cause Hearing for pre-conviction revocation of Petitioner's parole. The stay was vacated on June 30, 1995 due to the Board's approval of the Chief's motion for Petitioner's continued detention pending the outcome of the accelerated revocation proceedings. The probable cause hearing was held on July 6, 1995. On July 10, 1995, the Hearing Officer concluded that despite the fact probable cause existed to believe Petitioner violated his parole, his parole should be continued pending final determination by the paroling authority. This decision, however, was overruled by the Parole Board who decided to keep Petitioner incarcerated pending their review of the case.[7] After another appeal to the Appellate Division, on July 24, 1995 Petitioner was yet again ordered to be released.[8] Nonetheless, the supreme

---

5. In this, the second reversal of the Parole Board, the Appellate Division stated:

   The motion for leave to appeal is granted. The issuance of the parol warrant is summarily reversed. The warrant is vacated. Defendant may be released. The Board may continue statutorily authorized parole revocation proceedings. The State's oral motion to stay this order is denied.

   *Hunterson v. New Jersey State Parole Board,* (App.Div., Dec. 27, 1994); Pet'r's Ex. 23.

6. The June 20, 1995 order of the Appellate Division stated:

   The procedures set forth in *N.J.S.A.* 30:4–123.60 and *N.J.A.C.* 10A:71–7.1 were not followed by the parole authorities in this case. As a result, a warrant was issued and Hunterson was returned to jail without the required findings that the charge against him is serious and that he poses a danger to the public safety. Hunterson is charged with a fourth-degree possessory drug offense. In light of the fact that he was arrested on this charge over nine months ago and the parole warrant did not issue until June 15, 1995, it is obvious that no emergency justifying departure from the mandatory statutory and regulatory procedures exists....

   *Hunterson v. New Jersey State Parole Board,* (App. Div., June 20, 1995); Pet'r's Ex. 46.

7. In a July 13, 1995 inter-office memorandum from Charles Anderson, the hearing officer who conducted the July 6, 1995 hearing, to Victor R. D'Ilio, Chief of the Bureau, Anderson stated:

   In taking into account the testimony of all parties involved, and carefully reviewing the factor's [sic] pertaining to this case, it remains the opinion of this Hearing Officer, that my initial decision remains the same. The witnesses involved in this Hearing process, didn't give testimony to indicate that the subject is a threat to the community.

   Letter from Anderson to D'Ilio dated 7/13/95; Pet'r's Ex. 68. Hearing Officer Anderson also sent a similar memorandum the previous day to Mario Paparossi, in which he indicated:

   Since the rendering of my decision, I have received approximately 3–4 memo's [sic] from the Chief's Office and the New Jersey State Parole Board; Not to mention, numerous telephone calls as well.

   Letter from Anderson to Paparossi dated 7/12/95; Pet'r's Ex. 64. This would appear to support Petitioner's contention that his imprisonment was motivated by political retaliation, as his release apparently caused much concern with the higher officials within the Bureau.

8. In this order, the Appellate Division concluded:

   The statutory scheme contemplates that an individual who has been paroled and is

court reversed this order on July 25, 1995 without explanation.

### B. *The Accelerated Parole Revocation Hearing*

The final hearing to adjudicate the Bureau's application for accelerated revocation under N.J. Stat. Ann. § 30:4–123.60 was held on September 29, 1995. Petitioner was represented by privately retained counsel Lawrence Magid, Esq., and the Bureau of Parole was represented by Mario Paparozzi, Esq., the Acting Deputy Compact Administrator of the Office of Interstate Service, Bureau of Parole. In the context of this hearing which was held before Hearing Officer Timothy J. Murphy, the Bureau had the burden of showing by clear and convincing evidence that Petitioner had seriously or persistently violated the conditions of his parole, and that revocation of parole was desirable. *See* N.J. Admin. Code §§ 10A:71–7.3 and 10A:71–7.12.

A number of people testified at this hearing. First, the Bureau called Officer Charles B. Bitchakjian of the Winslow Township Police Department, the officer who arrested Petitioner a year prior for possession and possession with the intent to distribute marijuana on September 29, 1994. The Hearing Officer found, and it is not seriously contested given Petitioner's subsequent guilty plea (to the possessory offense but not the distribution offense), that Petitioner possessed marijuana on that date. The Hearing Officer also noted

charged with a criminal offense but not yet convicted, will not be returned to custody pending a revocation hearing unless the offense with which he is charged is serious and he is a danger to the public safety. *N.J.S.A.* 30:4–123.60. This record supports neither of these conclusions as to Hunterson....

*Hunterson v. New Jersey State Parole Board*, AM–1369–942T (App.Div., July 24, 1995); Pet'r's Ex. 73–76.

that "[t]his determination, however, begins rather than ends the relevant inquiry into the matter, for in its application the Bureau alleges that the pending criminal charge is a serious one and that Mr. Hunterson poses a danger to the public safety." Timothy Murphy's Hearing Summary to Adult Panel at 2 ("Hearing Summary"), dated 10/30/95; Pet'r's Ex. 82–90.

The Bureau next called Ron Holvey, an investigator in New Jersey State Prison Internal Affairs. Investigator Holvey testified to a conversation he had with an inmate who saw Petitioner at a fund-raising benefit for a member of the South Jersey Chapter of the Pagans motorcycle gang on April, 21 1995.[9] The inmate allegedly saw Petitioner at this rally with Robert "Mudman" Simon. Investigator Holvey also read from someone else's police report that implicated Petitioner in an allegedly terroristic threat against John Bucanis, Petitioner's half-brother. In his Hearing Summary, the Hearing Officer noted that Investigator Holvey's testimony was rank double-level hearsay but felt it corroborated the testimony of Trooper Glen Pender, who stopped Petitioner en route to the Pagan fund-raiser on April 21, 1995. Hr'g Summary at 5; Pet'r's Ex. 86.

Following Investigator Holvey, the Bureau called Lieutenant A. Potter of the New Jersey State Police to tell of Petitioner's interaction with Ralph DeFabio, a member of the Warlocks motorcycle gang known as Dago, who Petitioner threatened over the telephone on July 9, 1992

9. Interestingly, this information was not discovered through surveillance but through Petitioner himself when he was stopped by police for speeding on his way to the event and asked the police for directions. This was elicited through New Jersey State Trooper Glenn Pender.

and August 5, 1992. The first conversation, introduced only through double-level hearsay, prompted DeFabio to contact law enforcement authorities and record the August 5, 1992 conversation. In this conversation, Petitioner, who apparently was upset that DeFabio had stolen his car and somehow assisted in his murder conviction, suggested that he would seriously harm DeFabio and his family.[10] This threat, however, was not previously used to support any of the parole violator warrants and had occurred years before his arrest for marijuana, which was the impetus of the parole revocation proceedings.

Petitioner also called witnesses in his defense. First, his neighbor Ms. Cynthia Duble who had known Petitioner for sixteen months testified that he was "like a relative" and "is a good man." Tr. Accelerated Revocation Hr'g, Test. of Duble, Sept. 29, 1995 at 110, 114. She also stated that she knew Petitioner was incarcerated for murder but was still comfortable with having her three young children in Hunterson's presence unattended. Tr. Accelerat-

ed Revocation Hr'g, Test. of Duble, Sept. 29, 1995 at 115; Hr'g Summary at 5.[11]

Next, Petitioner called his employer Ray Menear who had known Petitioner for over thirty years and unhesitatingly testified to Petitioner's good character. Petitioner was described as a "[v]ery able worker" and Mr. Menear stated that he had to hire three other workers to replace him. Tr. Accelerated Revocation Hr'g, Test. of Menear, Sept. 29, 1995 at 121. It was also stated that Petitioner was permitted to work on jobs in secure facilities that require background checks, such as for the Federal Reserve. Mr. Menear testified that Petitioner has changed since his 1971 arrest, and when asked if he considered Petitioner to be a danger, he responded:

Not in the least. I mean he's been in my house. He's welcome in my house any time. Other people that he works with he would be welcome at their house. It's hard to believe even like some of the things that's gone on that this is the same person that's done this stuff. . . .

Tr. Accelerated Revocation Hr'g, Test. of Menear, Sept. 29, 1995 at 122–23.[12]

10. In this conversation, Petitioner told DeFabio, among other things, "I'll come to your house with your family, fuck you, your kids and your mother, punk." Tr. of Aug. 5, 1992. Investigator Kurt Levins of the Camden County Prosecutor's Office also testified to the circumstances surrounding this conversation.

11. The Hearing Officer reported that "[t]his strong testimony is either persuasive proof of Hunterson's good character or a striking testament to this mother's poor judgment." Hr'g Summary at 5.

Ms. Duble also testified at the July 6, 1995 probable cause hearing on Petitioner's behalf. She testified that Barry Wright, a Winslow Township Police Lieutenant who knew Petitioner since he was young and who Petitioner asked to testify for him, was contacted by the DOC and told not to testify for Petitioner. Fearful of losing his job, Officer Wright told Ms. Duble he could not testify for Petitioner. Tr. Revocation Hr'g, Test. of Duble, July 6, 1995 at 26–27.

12. On further examination by the Hearing Officer, Mr. Menear was asked if he felt the prohibition against possession of marijuana to be a legitimate rule of society. Noting that he does not smoke or drink, Mr. Menear said, "I don't think it's as big a deal as it used to be[.]" Tr. Accelerated Revocation Hr'g, Test. of Menear, Sept. 29, 1995 at 124–25. Mr. Menear drew a parallel to the serious offense of driving under the influence of alcohol, noting the much harsher treatment given to marijuana possession: "If you want to like collectively persecute people that drink and drive with people that smoke a joint, it should be the same deal. You don't see a lot of people getting hauled off to jail for drinking and driving." Tr. Accelerated Revocation Hr'g, Test. of Menear, Sept. 29, 1995 at 25. In the Hearing Summary, the Hearing Officer characterized this testimony as a flat indication that Mr. Menear "did not regard the law prohibiting marijuana possession to be a legitimate rule of society." Hr'g Summary at 6.

The next witness called to testify was Parole Officer Thomas Flannery, who was Petitioner's parole officer for seven years when he was on regular status as well as his most recent parole officer. Preliminarily, he stated that he knew of no conditions that forbid Petitioner from associating with members of motorcycle gangs. Officer Flannery further testified that Petitioner was functioning well on parole, but that Petitioner sometimes felt angry because he thought that the system was trying to put him back into jail. This anger, however, was not considered to be an indication of violence,[13] and Officer Flannery testified that he saw nothing that would indicate Petitioner was a danger to society. Upon questioning by the Hearing Officer, Officer Flannery agreed with the Hearing Officer's hypothetical scenarios where a parolee convicted of murder who was arrested for marijuana possession could represent a danger to the community.

Senior Parole Officer Vincent Piccurelli was Petitioner's parole officer for two months in 1994, and testified that Petitioner was placed in an outpatient drug counseling program[14] but that he did not see Petitioner having any problems adjusting to parole. Apparently not satisfied with Officer Piccurelli's testimony that it was peculiar that a fourth degree possessory drug offense would result in an application for accelerated revocation, the Hearing Officer analogized Petitioner to a pedophile:

Q: Well, let me, as an example, if a person were on parole, and was identified as a pedophile was on parole for sexual assault of a six year old, would a fourth degree or even a DP trespass be troublesome if the trespass was at a primary school and he was found to be in the mens—the boy's bathroom?

A: Absolutely.

Q: Whereas trespass in a different scenario may not be so alarming?

A: It may carry different weight, that's correct.

Tr. Accelerated Revocation Hr'g, Test. of Piccurelli, Sept. 29, 1995 at 166.

The most striking testimony came from Senior Parole Officer Elaine Catherine Torres, who supervised Petitioner from October, 1992 to June, 1994. She told of how Petitioner had lived and cared for his terminally ill mother and unhesitatingly stated that:

There was nothing [about Petitioner] that was not positive. He was, he was one of the best parolees that I did supervise. He was constantly working to the point where I couldn't even connect to make a positive home visit. At that point I just stopped going to the home and I went to his job. He was always on the job. He was working two jobs, sometimes three jobs.

Tr. Accelerated Revocation Hr'g, Test. of Torres, Sept. 29, 1995 at 177. More importantly, she testified that Petitioner's case was treated differently from the other parolees. First, she commented that it was odd that the Bureau applied for accelerated parole revocation six months after

---

**13.** Officer Flannery stated: "Well, I mean except I saw that he was angry, you know, I saw that, but I mean outside of any acts or anything." Tr. Accelerated Revocation Hr'g, Test. of Flannery, Sept. 29, 1995 at 129. Petitioner's counsel went into this point further on redirect:

Q: And when you say he was angry, so I might understand better, routine anger kind of thing, something that was bothering him, not angry to the point where we just heard a moment ago where you were fearful that he might hit you or something like that?
A: Oh, no, sir.

Tr. Accelerated Revocation Hr'g, Test. of Flannery, Sept. 29, 1995 at 134.

**14.** This treatment was apparently instituted in response to the tainted urine samples that were later suppressed.

having informed Petitioner that it would suspend revocation proceedings until the charge for marijuana possession was adjudicated. Second, Officer Torres admitted to telling Petitioner that she believed his marijuana arrest was suspicious, because the day before the arrest one of her co-workers told her that he was going to tell the local police about Petitioner's allegedly tainted urine samples. Moreover, after she testified at the July 6, 1995 probable cause hearing where she stated that she did not feel Petitioner was a threat to the community, she received an unscheduled personnel assessment and was lowered two levels.[15] Following this, Officer Torres described a staff meeting where she and her co-workers were implicitly told not to disparage the Bureau or to "go to bat for the parolee." Tr. Accelerated Revocation Hr'g, Test. of Torres, Sept. 29, 1995 at 201, 210.

On cross-examination by the Bureau, Officer Torres stated that Petitioner had admitted to using marijuana, but that it did not significantly concern her, given the stress Petitioner was under because of his dying mother. Nonetheless, Officer Torres reported the admission to her supervisor, and Petitioner was placed on closer supervision for three-months, so that if he did not test positive for drugs in this period he would revert back to quarterly reporting status. Apparently, Petitioner did not test positive until the third month, when his urine sample showed methamphetamine use. This test result, which Officer Torres plainly stated that she did not believe, was later suppressed by the Appellate Division.

The Hearing Officer pressed Officer Torres on her opinion that the police had treated Petitioner differently:

Q: I don't think that's very professional. They singled him out like they have been-like they have been doing since he got out in '92. They don't like him.
A: Who is they?
Q: Many of the officers at district officer number seven, many of them.
Q: They don't like him?
A: That's correct because they see his tatoos, because they see his long hair, because they see this mustache and because I guess he does not conform to a three piece suit like they wear every day.

Tr. Accelerated Revocation Hr'g, Test. of Torres, Sept. 29, 1995 at 222. The Hearing Officer posed another hypothetical:

Q: What if under a hypothetical the person who was on parole for the double life for the murder and kidnap, the crime itself occurred while he or she was using marijuana, would the fact of possession of marijuana be a little more troubling?
A: It would not alter knowing him. Seeing the progress that he made in the 20 months that I supervised him, I can't think of anything that has happened to him that has really—that has ever set him back so to speak. Hunterson just kept going forward and forward and forward.

Tr. Accelerated Revocation Hr'g, Test. of Torres, Sept. 29, 1995 at 222.

The last witness called at the hearing was Risa S. Dawson of the Office of Interstate Services. She testified that Petitioner had admitted the July 9, 1992 threat against DeFabio and explained it as "want[ing] to fuck with DeFabio's head." Tr. Accelerated Revocation Hr'g, Test. of Dawson, Sept. 29, 1995 at 239. Petition-

---

15. Mario Paparozzi, Esq., who represented the Bureau in the hearing, stated on the record that, as the Acting Deputy Compact Administrator of the Office of Interstate Service of the Bureau, he had begun reforming the system of personnel evaluations. He stated that because of this, other employees' reviews were also lowered.

er's counsel elicited the fact that law enforcement authorities including Investigator Kurt Levins knew of the threats at the time that they were made but did not act upon them.

## C. *The Aftermath of the Accelerated Revocation Hearing*

The Hearing Summary, dated October 30, 1995, was submitted to the Adult Panel of the Parole Board and contained the Hearing Officer's analysis and conclusions. The report stated:

> Under the specific circumstances of this case, the Hearing Officer is persuaded that the crime charged is a serious one and that Mr. Hunterson represents a substantial threat to public safety, given his apparent return to drug use and the lack of measurable success of the June, 1994 outpatient drug counseling. Although there is substantial evidence that Mr. Hunterson has attempted to stabilize his life and successfully reintegrate, on balance, the Hearing Officer is unpersuaded that he has met the challenge.

Hr'g Summary at 7. The report concluded:

> [Petitioner's] behavior in this respect projects a troubling immaturity of judgment, as well as an inability to abide by limitations imposed by administrative and statutory authority, When coupled with the threats to DeFabio, the admitted marijuana use and his presence at the April 1995 Pagan benefit, there begins to emerge the profile of an individual constitutionally incapable of adopting

a manner of living which requires strict adherence to the rules of society.

Hr'g Summary at 8.

Consequently, during a meeting held on November 1, 1995, a two-member board of the Adult Panel of the New Jersey State Parole Board revoked Petitioner's parole and referred the case to a three-member board panel pursuant to N.J. Admin. Code § 10A:71–7.16 to impose a future eligibility term outside the guidelines set forth in the Code.[16] It advised Petitioner that "THE REASON FOR THIS ACTION IS PREDICATED UPON YOUR EXTENSIVE PRIOR CRIMINAL RECORD AND THE CIRCUMSTANCES SURROUNDING YOUR PRESENT COMMITMENT OFFENSE: MURDER AND KIDNAPING." Notice of Decision dated 11/6/95; Pet'r's Ex. 92.

The three member panel of the Board imposed a five year future eligibility term ("FET") on January 24, 1996. This FET, essentially the sentence for the parole violation, renders Petitioner ineligible for parole for this period of time. Unlike a sentence, however, this does not guarantee his release after the sentence, but only puts Petitioner in the position of again applying for parole. Just over a month later on March 3, 1996, Petitioner pled guilty to the September 29, 1994 disorderly persons offense of possession of marijuana, receiving only fines and a six month revocation of his driver's license which was made effective on May 3, 1996.

Petitioner's administrative appeal of the FET to the Parole Board was denied on April 3, 1996. He then appealed to the

**16.** New Jersey Administrative Code 10A:71–7.16 states, in pertinent part:

  A three-member Board panel may establish a future parole eligibility date which differs from that otherwise required by the provisions of this section if the future parole eligibility date ... which would otherwise

be established pursuant to this section is clearly inappropriate in consideration of the circumstances of the parole violation and the characteristics and prior criminal record of the parolee.

N.J. Admin. Code § 10A:71–7.16(p).

Appellate Division, which remanded the case back to the Board to reconsider the denial in light of the fact that the Board was not then aware that the guilty plea to possession was downgraded from a fourth degree offense to a disorderly persons offense. Petitioner maintained that this disorderly persons offense was not sufficiently serious to support the five year FET, a sentence well outside of the scheduled guidelines of N.J.A.C. 10A:71–7.16. The FET, however, was sustained by a three-member panel of the Board on April 10, 1996.

On July 20, 1996, Petitioner filed a statement of facts as part of an appeal to the full Parole Board. On August 28, 1996, the Board rendered its final administrative decision denying all relief.[17] Petitioner appealed this decision to the Appellate Division on October 7, 1996, and later on December 16, 1996 filed a Motion for Emergent Relief, Writ of Habeas Corpus and/or Stay Pending Appeal. The emergent motion was denied by the New Jersey Supreme Court on May 6, 1997 and the appeal of the final administrative decision was denied by the Appellate Division on September 5, 1997. Certification was denied by the supreme court on January 15, 1998.

On June 3, 1998, Douglass Chiesa, the Deputy Executive Director of the New Jersey Bureau of Parole informed the Court of the most recent events regarding Petitioner's case. Petitioner received a hearing before a panel of the Board on May 21, 1998 resulting in the denial of his parole and the imposition of a thirty-six month FET. This decision was vacated the following day and Petitioner received another hearing before a different panel of the Board on May 27, 1998. This panel also denied parole but did not impose a FET at that time. On August 24, 1998, Mr. Chiesa confirmed that no further action had been taken.

### D. Procedural History of the Petition for Habeas Corpus

Petitioner filed the instant petition for habeas corpus pursuant to 28 U.S.C. § 2254 on February 6, 1998, claiming that he is being held in violation of the Constitution and laws of the United States. Specifically, he

challenges the illegal restraint and confinement by virtue of revocation of parole where: (1) Orders revoking parole are claimed to be void for any substantial evidence to secure arrest warrants under the accelerated parole revocation statutes[;] (2) Where the revocation hearing was defective depriving petitioner of U.S. Constitutional protections provided by the 1st, 4th, 5th, 6th, 8th, and 14th Amendments[;] and (3) Where the actions of the New Jersey State Parole Board were improper and illegal.

Pet'r's Mem. Supp. Pet. at 8 (citations omitted). Along with his petition and legal memorandum, Petitioner submitted numerous exhibits and transcripts from the relevant proceedings.

Respondents—represented by the New Jersey Office of the Attorney General-filed a two and one-half page Answer to the petition on March 4, 1998 contending the petition should be dismissed for Petitioner's failure to exhaust his administrative remedies. In support of this argument, Respondents included a copy of a complaint Petitioner submitted to the Law Division of the New Jersey Superior Court, Mercer County, on January 26, 1998, in

---

**17.** The Board determined that Petitioner's claims were without merit, noting that Petitioner's "struggle with substance abuse is long standing and includes an admission to your Parole Officer in early 1994 of your return to drug use since December 1993." Letter to Pet'r from Parole Board dated 8/28/96, Pet'r's Ex. 123.

which Petitioner sought an Order to Show Cause requiring the Parole Board to correct calculations regarding his parole eligibility, to be reinstated for parole and to investigate his parole plans.

Petitioner responded with a Traverse filed on March 17, 1998, noting that he already obtained the relief he sought in the complaint before the Law Division, mooting the argument that this Complaint represented an unexhausted administrative remedy. On March 28, 1998, a letter was received from Respondents [18] purporting to be "a response to the papers filed by the petitioner following [the] answer to the habeas petition and as a supplement to the answer." Letter from Resp't dated 1/7/98 at 1.[19] In these two pages of unauthorized correspondence, Respondents reassert their position that Petitioner has not exhausted his administrative remedies, and argue that Petitioner is scheduled to be given a parole release hearing in May of 1998. Respondents also note, without explanation, that "[i]t is highly doubtful whether the claims presented in the petitioner are true *federal* claims." *Id.* at 2 (emphasis in original).

Subsequently, on April 29, 1998, Petitioner filed a letter brief "in Support of Petitioner's Objection" to the Respondents' various procedural deficiencies. Petitioner points out that Respondents' Answer failed to follow Rule 5 of the Rules Governing Habeas Corpus by not responding to the allegations of the petition, and that they were never granted leave of court to supplement their Answer.[20] Respondents did not file any response to this submission.

On the same date that Petitioner filed his Traverse, he also filed a Motion to Compel Discovery pursuant to Rule 6 of the Rules Governing § 2254 Petitions. In this motion, petitioner includes a Request for Production of Documents with 21 specific areas or items he claims are necessary to "fully develop and illuminate the facts of his claim." Pet'r's Mem. Supp. Mot. Conduct Discovery at 2. Again, Respondents have not responded.

On July 6, 1998, this Court issued an Order that addressed Respondents exhaustion argument. Essentially, because Petitioner had already received the relief he sought in the state court complaint, this issue was found to be moot. Additionally, as the Court was still without any response to the merits of Petitioner's claims, Respondents were directed to file an Answer to the petition in conformance with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts. Their Answer, received on July 14, 1998, states that the Appellate Division found Petitioner's claims to be without merit on September 5, 1997, and that under the strict standard of review, this determination does not rise to the level of unreasonableness that would support granting the writ of habeas corpus. Petitioner's Traverse was received on July 29, 1998.

## DISCUSSION

A. *Standard of Review Under 28 U.S.C.* § 2254

█ It is a long standing rule that "[f]ederal courts in habeas corpus cases are required to give deference to the factual findings of both the state trial and appellate courts." *Dickerson v. Vaughn*, 90 F.3d 87, 90 (3d Cir.1996) (citing *Parke v.*

---

**18.** This letter was improperly sent directly to chambers, rather than to the clerk's office for docketing and filing.

**19.** For some unexplained reason, this letter was dated January 7, 1998.

**20.** In this submission, Petitioner also chastises Respondents for not following the procedures outlined by the Honorable Stephen M. Orlofsky in *Ukawabutu v. Morton*, 997 F.Supp. 605, 1998 WL 113672 (D.N.J. March 9, 1998).

*Raley,* 506 U.S. 20, 36, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992)). While these questions of fact were traditionally given respect, legal rulings by state courts were given no deference at all. In 1996, however, 28 U.S.C. § 2254 was amended by the Anti Terrorism and Effective Death Penalty Act. *See* 28 U.S.C. § 2244. The new § 2254 affords state court rulings—those that are either legal questions or mixed questions of law and fact—a great deal of deference upon review:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This creates a much greater burden for a petitioner to overcome when challenging a state court judgment in federal court. The Fifth Circuit Court of Appeals, for example, has interpreted this standard as follows:

> The "unreasonable application" standard requires more than the disagreement with the decision of the sate court, which would amount to the functional equivalent of *de novo* review. Therefore, "an application of law to facts is unreasonable only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect...."

*Carter v. Johnson,* 110 F.3d 1098, 1103 n. 4 (5th Cir.1997) (citing *Drinkard v. Johnson,* 97 F.3d 751, 769) (5th Cir.1996),[21] *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997).

### B. *Petitioner's Claims*

Petitioner divides his constitutional claims into seven general areas. First, he claims that the Bureau violated the Due Process Clause of the Fourteenth Amendment, both the state and federal constitutions and the fundamental fairness doctrine through its administration of his parole and its subsequent applications for accelerated parole revocation. Second, Petitioner argues that the New Jersey Supreme Court violated both the Due Process and Equal Protection Clauses of the Fourteenth Amendment when it twice stayed the orders of the Appellate Division to release him. Third, the conduct of Hearing Officer Murphy is alleged to have violated both the state and federal constitutions. Fourth, Petitioner contends that the Parole Board's decision to impose a FET beyond the usual statutory guidelines was arbitrary, capricious and a violation of due process. Fifth, Petitioner claims that the New Jersey Department of Corrections and Board of Parole selectively prosecuted him in violation of the First, Eighth and Fourteenth Amendments. Petitioner's sixth point seems to focus on the Appellate Division's affirmance of the Parole Board's revocation and imposition of the FET. Finally, Petitioner argues that his continued incarceration is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. As mentioned above, Respondents have not confronted these allegations on the merits, but have argued that Petitioner cannot overcome the very high standard of review for § 2254 cases

---

**21.** *Drinkard* was overruled on other grounds relating to the prospective—only application of a new provision created by the Anti Terror-

ism and Effective Death Penalty Act. *See Nobles v. Johnson,* 127 F.3d 409, 413 (5th Cir. 1997).

**542**

in light of the broad discretion afforded to the Board regarding parole decisions.

If all of Petitioner's claims were to be accepted, he would have been subjected to a score of egregious violations of the United States Constitution at virtually every stage of each one of the proceedings. While it is apparent that this is not the case, Petitioner does raise many very serious concerns. His most compelling claim is that the Board of Parole, in revoking his parole and imposing FETs outside the guidelines, acted impermissibly and in violation of Petitioner's substantive due process rights.

■■■■ "[T]he liberty [of a parolee] is valuable and must be seen as within the protection of the Fourteenth Amendment." *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).[22] Nonetheless, "from a constitutional standpoint, there is no inherent right to parole." *Raymond v. New Jersey State Parole Bd.*, 221 N.J.Super. 381, 387, 534 A.2d 741 (App. Div.1987) (citing *Greenholtz v. Inmates of Nebraska Penal*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979)); *see Morrissey*, 408 U.S. at 480, 92 S.Ct. 2593 (1972) ("the revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations."); *see also Miller v. Plantier*, 1991 WL 169395, *2 (D.N.J. Aug. 30, 1991) (unpublished) ("parole revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly depended

on observance of special parole restrictions."). It is once parole is granted that principles of due process govern its revocation. *Raymond*, 221 N.J.Super. at 387, 534 A.2d 741 ("once an inmate has been granted a 'liberty interest' by the State, due process protections are necessary to insure against its arbitrary abrogation.") (citing *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); *Jenkins v. Fauver*, 108 N.J. 239, 247, 528 A.2d 563 (1987)); *Gerardo v. New Jersey State Parole Bd.*, 221 N.J.Super. 442, 448, 534 A.2d 1037 (App.Div.1987) ("[T]here is no question but that due process applies to parole eligibility decisions."). Thus, while there may not be an automatic entitlement to parole, curtailment of the statutorily created expectation of release is subject to the protection of the Due Process Clause. *See Vitek v. Jones*, 445 U.S. 480, 488, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) ("[O]nce a State grants a prisoner the conditional liberty properly dependent on the observance of special parole restrictions, due process protections attach to the decision to revoke parole.") (citing *Greenholtz*, 442 U.S. at 7, 99 S.Ct. 2100; *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33. L.Ed.2d 484 (1972)). As can be seen, Petitioner has a state-created liberty interest in parole. *New Jersey State Parole Bd. v. Byrne*, 93 N.J. 192, 203–206, 460 A.2d 103 (1983); *Thompson v. New Jersey State Parole Bd.*, 210 N.J.Super. 107, 120, 509 A.2d 241 (App.Div.1986).

■■■ Parole revocation proceedings like the one at issue in this case generally

---

**22.** The Supreme Court in *Morrissey* outlined the minimum requirements of procedural due process for parole revocation proceedings:

(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifical-

ly finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Morrissey*, 408 U.S. at 489, 92 S.Ct. 2593.

involve two different stages. The first concerns the factual question whether one or more of the conditions of parole were violated. *See Morrissey,* 408 U.S. at 479, 92 S.Ct. 2593. If they were, the second stage involves the more complex question of whether the parolee should be reimprisoned. *Id.* at 479–80, 92 S.Ct. 2593. Due process applies to both stages. Here, it is clear that Petitioner violated his probation by his possession of marijuana and subsequent guilty plea to this disorderly persons offense. It is disputed whether other incidents, such as Petitioner's attendance at the Pagan benefit, comprise violations of the conditions of his parole, but given the fact that at least one condition was violated, the analysis must focus on the second step. This involves the propriety of the Parole Board's action in revoking his parole and levying a FET above the statutory guidelines.

■ In the context of parole revocation proceedings, due process is most often discussed in terms of the procedural protections it provides. Nonetheless, the Fourteenth Amendment also affords substantive protections against the arbitrary deprivation of "life, liberty, or property, without due process of law[.]" U.S. Const. amend XIV, § 1; *see Beatham v. Manson,* 369 F.Supp. 783, 791 (D.Conn. 1973) ("[D]ue process also extends some substantive protection against wholly arbitrary official conduct, for procedural protection would be rendered largely illusory if state action could be premised on the flip of a coin.").

■■ "The touchstone of Due Process is freedom from arbitrary governmental action." *Gerardo,* 221 N.J.Super. at 448, 534 A.2d 1037 (quoting *Ponte v. Real,* 471

U.S. 491, 495, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985)). Of course, hearings before the Parole Board are "impregnated with highly predictive and individualized discretionary appraisals." *Thompson v. New Jersey State Parole Bd.,* 210 N.J.Super. 107, 115, 509 A.2d 241 (App.Div.1986) (quoting *Beckworth v. New Jersey State Parole Bd.,* 62 N.J. 348, 359, 301 A.2d 727 (1973)). However, this does not mean that the Board has unlimited discretionary power or authority. *See Monks,* 58 N.J. at 242, 277 A.2d 193. As an administrative agency, the Parole Board's actions are subject to review "to determine if its power is being exercised arbitrarily or capriciously." *In re Hawley,* 98 N.J. 108, 112, 484 A.2d 684 (1984) (citing N.J. Const. (1947), art. VI, § 5, ¶ 4; R. 2:2–3(a)(2); *In re Senior Appeals Examiners,* 60 N.J. 356, 290 A.2d 129 (1972); *Monks,* 58 N.J. at 238, 277 A.2d 193); *see also United States v. Torquato,* 602 F.2d 564, 568 (3d Cir.1979) (declaring in context of selective prosecution that "[t]o permit criminal prosecutions to be initiated on the basis of arbitrary or irrational factors would be to transform the prosecutorial function from one protecting the public interest through impartial enforcement of the rule of law to one permitting the exercise of prosecutorial power based on personal or political bias.").

■ Given the standard of review applicable to § 2254 petitions, and considering the weight that must be given to the Board's discretionary decisions, *see State v. Lavelle,* 54 N.J. 315, 325, 255 A.2d 223 (1969), it cannot be said that the Appellate Division's affirmance of the Board's initial decision on November 1, 1995 to revoke Petitioner's parole was arbitrary or capricious or an abuse of discretion.[23] Evidence

---

**23.** Section 10A:71–7.12 of Chapter 7 of the New Jersey Administrative Code, entitled "Parole revocation hearing" states, in pertinent part:

(c) If the parolee has not been convicted of a crime committed while on parole or in the case of a juvenile parolee not adjudicated delinquent for an act which, if commit-

was presented at the September 29, 1995 accelerated revocation hearing that Petitioner possessed approximately 50 grams of marijuana, a clear violation of the terms of his parole. Additionally, the tape recording of the threat Petitioner had made to DeFabio on August 5, 1992 was introduced. While this appears to be a serious threat, no action was taken at the time it was made. Nonetheless, given the record, the affirmance of the decision to revoke parole was satisfactorily supported by the record and was therefore not inappropriate.

▇ The harder question, however, deals with the affirmance of the Board's imposition of a longer FET than normally required by statute. The Appellate Division reasoned that:

[C]haracterizing the case as one involving conviction for a disorderly persons offense simply misconceives the nature and import of his problematic conduct. Standing alone, the disorderly persons offense (which does not qualify as criminal conduct) could have subjected Hunterson to a one year FET with a possible upgrade to 15 months at the hands of a two member panel. N.J.S.A. 30:123.64(b); N.J.A.C. 10A:71–7.16(b)(4). Referral to the three member panel was based on the two member panel's conclusion that the guideline figure was clearly inappropriate. Given that immediately upon parole, Hunterson fell back into the type of conduct which led to his initial convictions for serious crimes, we cannot say that the parole revocation and the five year FET set by the three member panel and approved by the

Board was arbitrary or lacked inherent credible supporting evidence.

*Hunterson v. New Jersey State Parole Bd.,* (App.Div., Sept. 5, 1997) at 6; Pet'r's Ex. 131. The court was concerned with Petitioner's apparent return to his "errant ways through continued drug abuse; association with motorcycle gang members; and threats[.]" *Id.*

Many aspects of the Appellate Division's affirmance of the March 13, 1996 decision to impose a five year FET are troubling. This is primarily because the Board's decision itself was unsupported by the evidence. The decision began with a description of Petitioner's anti-social conduct that ultimately led to his incarceration. This conduct-including drug use and violence-is a very serious matter; however, it occurred over a quarter of a century ago. While prior conduct and the underlying crime are certainly appropriate considerations for parole decisions, they are not determinative. If every act which led to incarceration could automatically support the denial or revocation of parole, the entire parole system would be superfluous for those convicted of certain crimes, for the Board could deny parole based on nothing more than the type of crime for which they were convicted. This completely ignores the rehabilitative aspects of the criminal justice system. More importantly, Petitioner was paroled under a system enacted by the legislature, a system that granted Petitioner an expectation and a liberty interest in being released on parole. If it is felt that the circumstances of his crime justify life imprisonment without parole, it falls to the legislature to make that decision, not the Parole Board. As

---

ted by an adult, would constitute a crime, the purpose of the revocation hearing shall be to determine:

1. Whether, by clear and convincing evidence, the parolee has seriously or persistently violated the conditions of parole; and

2. Whether the revocation of parole is desirable.

N.J. Admin. Code § 10A:71–7.12(c).

mentioned above, the Board has "broad but not unlimited discretionary powers." *Monks*, 58 N.J. at 242, 277 A.2d 193. It must strictly abide by the criteria outlined by the legislature and cannot substitute its own judgment in its place. *See Glover v. New Jersey State Parole Bd.*, 271 N.J.Super. 420, 423, 638 A.2d 929 (App.Div.1994) (holding Parole Board, despite its discretionary authority, can not disregard judgments entered by the Superior Court). The Board's reasoning that placed such emphasis on Petitioner's decades-old conduct is conspicuously strained.

After considering Petitioner's past conduct, the Board described the September 29, 1994 traffic stop where Petitioner was found to possess marijuana, a charge which had not yet been downgraded from a fourth degree crime to a disorderly persons offense. Next, the Board's decision considered the threats Petitioner made to DeFabio in 1992. Interestingly, these threats (one of which was introduced only through double hearsay) were not seen as a danger when they were made, but were resurrected years later for purposes of the revocation hearings. This is even more striking given the fact that the August 5, 1992 conversation was well known to law enforcement authorities.

Finally, the Board stated that it was "troubled" by Petitioner's presence at the April 1995 Pagan fundraiser. His attendance at this function, as the Board admitted, was not prohibited by the terms of his parole. This was far from a clandestine meeting with the criminal element that Petitioner sought to hide from authorities as the Board would imply; in fact, Petitioner told police of his destination and even asked them for directions. Placing such emphasis on this activity, which was clearly not a parole violation, continues to mischaracterize Petitioner's conduct on parole.

Certainly Petitioner's conduct, specifically the marijuana possession, could have and should have supported revocation of parole. It clearly does not, however, support a FET in the amount of five years, an enormous departure above the statutory guidelines. According to the Administrative Code, the relevant inquiry at the revocation is "[w]hether, by clear and convincing evidence, the parolee has seriously and persistently violated the conditions of parole" and "whether revocation of parole is desirable." N.J. Admin. Code. § 10A:71–7.12(c). It is debatable whether the single disorderly persons offense of possession of marijuana could even be considered a "serious or persistent" violation of parole conditions. Moreover, if Petitioner was sentenced under the normal guidelines, he still could have received up to fifteen months incarceration. Section 10A:71–7.16(p) requires that this FET be "clearly inappropriate" to refer it to the three-member panel for an upgraded term. It was not. The decision to impose the five year term was arbitrary and capricious, and a clear abuse of discretion.

The Appellate Division's affirmance of this decision found that the Board acted within its discretion, adopting its reasoning for the upgraded FET. It is worth noting that in its opinion, the court labored under the belief that Petitioner was paroled in 1982, thus serving only ten years of his sentence, when he actually served twenty years. *See Hunterson v. New Jersey State Parole Bd.*, (App.Div., Sept. 5, 1997) at 1, 6. This is problematic in two regards. First and foremost, it evidences an unfamiliarity with the record; second, it may have given the impression that Petitioner had not fully paid his debt to society.

Furthermore, the premise of both the Board's decision and the appellate court's affirmance is that Petitioner's possession of marijuana evidenced a return to his

law-breaking days because he previously committed the murder for which he was incarcerated while under the influence of alcohol and marijuana. This marijuana possession (coupled with the years-old threat and other factors that did not constitute parole violations) apparently made Petitioner "constitutionally incapable of adopting a manner of living which requires strict adherence to the rules of society." Hr'g Summary at 8. This conclusion was reached without the benefit of any scientific or medical authority that would suggest that this proposition-that the use of marijuana causes violent behavior-applies under the circumstances of this case. In fact, there is a great deal of support for the proposition that marijuana does not induce violence. As early as 1944, a study commissioned by New York Mayor Fiorello La Guardia found that "there was no proof that marijuana caused antisocial, aggressive, or criminal behavior." Gregg A. Bilz, *The Medical Use of Marihuana: The Politics of Medicine*, 13 Hamline J. Pub.L. & Pol'y 117, 121 (Spring 1992) (citing "The Marijuana Problem in the City of New York" (1944)); *see* National Commission on Marihuana and Drug Abuse, Pub.L. No. 91–513, 91st Congress, H.R. 18583 (1972) ("The empirical evidence gathered to date lends no support to the hypothesis that marijuana heightens aggressive tendencies in the user or that its effects significantly increase the likelihood of inciting the user to violence or crime ...."); *see also* Steven Wisotsky, *Drug Facts Don't Matter: A Brief Comment on Drug Prohibition: An Unnatural Disaster*, 27 Conn.

L.Rev. 639 (Winter 1995). Thus, while marijuana possession was clearly a violation of a condition of Petitioner's parole, it can not be perverted into an indicator of future violence. This merely highlights the unsupportable mischaracterizations advanced by the Hearing Officer, adopted by the Board and ultimately affirmed by the Appellate Division. Even under the stringent standard of review imposed by 28 U.S.C. § 2254, the conclusion is inescapable that the Appellate Division's affirmance of the Board's decision to impose a five-year FET was unreasonable.[24]

While it is not a constitutional right, Petitioner clearly has a liberty interest in parole release. Consequently, this interest cannot be abridged without due process of law. It is clear that the upgraded FET of five years represents an arbitrary and capricious decision, an abuse of discretion and a violation of Petitioner's substantive due process rights. At most, Petitioner should have received a fifteen month FET under N.J. Admin. Code. § 10A:71-7.16. Instead, he has been incarcerated for nearly four years, the Board has again revoked his parole and plans to set yet another FET in the future. Petitioner has served far more than the maximum time that he should have received, and the only appropriate remedy in this case is Petitioner's immediate release on parole.

## CONCLUSION

From the time of Petitioner's initial arrest on September 29, 1994 for what ultimately turned out to be a disorderly per-

---

24. It is important to note that this analysis does not take into consideration the extensive testimony presented by Petitioner's witnesses at the hearings that showed Petitioner in a very positive light and greatly undermined the suggestion that Petitioner posed a threat of recidivism or was a danger to the community. In light of the discretion given to the Board and the fact that the Hearing Officer was in a better position to evaluate the credibility of the witnesses, these witnesses' testimony do not factor into the discussion as they were apparently not credited by the Hearing Officer or the Board. Thus, the Board's decision and the Appellate Division's affirmance was arbitrary even when disregarding this testimony and viewing only the State's evidence.

sons marijuana possession, it is evident that the parole authorities have put forth a great deal effort to see him imprisoned for a substantial and disproportionate period of time.[25] At almost every step of the way, however, their actions were reviewed and vacated by the Appellate Division. The finding of probable cause for the first parole violator warrant was reversed on November 2, 1994, and the urine samples on which probable cause was based were suppressed because the State could not establish the proper chain of custody. The second finding of probable cause that was based on Petitioner's arrest for marijuana possession was similarly reversed on December 27, 1994. Undaunted, the parole authorities made another attempt to incarcerate Petitioner. Probable cause was again found for the parole violator warrant, but, like the others, was reversed on June 20, 1995. On July 24, 1995, yet another finding of probable cause was reversed. This Appellate Division decision, however, was reversed by the Supreme court without explanation.

Petitioner's final accelerated parole revocation hearing (filed on an accelerated basis even though it was not conducted until September 29, 1995, exactly one year after his initial arrest) was similarly injected with the bias. The Hearing Officer essentially disregarded every portion of testimony that was favorable to Petitioner-even when it was presented by parole officers-and grossly exaggerated the few negatives. Even assuming his opinion was the result of his credibility determinations, the Parole Board overstepped its authority in sentencing Petitioner to an extended future eligibility term of five years, a term 400% greater than the guideline maximum. The Appellate Division's affirmance of this unsubstantiated decision, even when

viewed under the strict standard of review for both administrative hearings and habeas corpus actions under 28 U.S.C. § 2554, was unreasonable. Accordingly, Petitioner's writ of habeas corpus must be granted.

For the foregoing reasons:

IT IS ORDERED on this—10th—day of September, 1998, that Petitioner Neil Hunterson's petition for writ of habeas corpus is **GRANTED.** Petitioner is to be released immediately.

IT IS FURTHER ORDERED that Petitioner's pending Motion to Compel Discovery is **DISMISSED AS MOOT.**

## OPINION ON RECONSIDERATION

This matter is before the Court on Respondents' Motion pursuant to Fed. R.Civ.P. 59(e) and Local Civ. R. 7.1(g) for Reconsideration of this Court's September 10, 1998 Order granting petitioner Neil Hunterson's Petition for a Writ of Habeas Corpus and ordering his immediate parole release. The Court has considered the September 14, 1998 submissions of the Respondents and Petitioner's September 24, 1998 Response thereto. As discussed below, the Court will grant the Motion for Reconsideration, and will reconsider its decision in order to formulate a proper remedy to afford petitioner habeas relief.

**BACKGROUND**

The facts underlying the case are laid out in this Court's Order of September 10, 1998. The procedural history since that Order was entered is as follows. On September 10, 1998, this Court found that Parole Board's decision to impose a five-year Future Eligibility Term ("FET"), and the Appellate Division's affirmance of that decision, was unreasonable and arbitrary.

---

**25.** Petitioner presented a considerable amount of evidence that tended to show that the parole authorities were impermissibly motivated by many external factors. Their motivations, however, are not important to the analysis, which focuses on their conduct.

This Court therefore granted Hunterson's petition for a writ of habeas corpus and ordered his immediate parole release.

On September 14, 1998, the respondents submitted the instant Motion for Reconsideration, and in support submitted a Notice of Decision dated September 9, 1998, but based on a May 27, 1998 panel hearing, which reflects a denial of parole and the referral of petitioner's case to a three-member panel for establishment of an FET. This newest Notice of Decision relied upon a March 11, 1998 confidential psychological evaluation and concluded that petitioner was "as much of a risk to commit a new crime if released on parole today as [he was] when [he committed the original offense]". This Court stayed the September 10, 1998 Order after the Attorney General of New Jersey submitted these documents *in camera* for the Court's review. However, the Court notes that such documents were not part of the record at the time the September 10, 1998 Order was filed.[1] The respondents acknowledge as much when they state, "The September 9 panel decision and the confidential psychological evaluation and interview relied upon by the panel constitute significant new information not previously available to the court which directly bears on the need for reconsideration of the court's September 10 order."

The respondents also argue that even if a substantive due process violation had occurred in this case, the proper remedy would be a remand to the agency for reconsideration, not a prisoner release order. In the event the Court deems such a remand to be the proper remedy, respondents argue, petitioner has now received a hearing and has been denied parole. Respondents state that "this case now stands in a completely different posture as a re-

sult of the new decision just issued by the Adult Panel denying parole based in large part on the recent negative confidential psychological evaluation and interview."

Petitioner has opposed the Motion for Reconsideration, claiming that rather than follow this Court's Order to release petitioner, the respondents manufactured evidence presented to the Court in support of the instant motion, including a "back-dated" September 9, 1998 Notice of Decision, which petitioner did not receive until it was faxed to him on September 14, 1998. Petitioner further charges that the Affidavit of Andrew Consovoy submitted in support of the motion is perjurious.

## DISCUSSION

■ The purpose of a motion for reconsideration pursuant to Rule 59(e) is to correct manifest errors of law or fact or to present newly discovered evidence, *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986), and, as such, a Rule 59(e) motion may be made for only one of three reasons: (1) an intervening change in the controlling law has occurred, (2) evidence not previously available has become available, or (3) it is necessary to correct a clear error of law or prevent manifest injustice. *See North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir.1995); *Elizabethtown Water Co. v. Hartford Cas. Ins. Co.*, 998 F.Supp. 447, 459 (D.N.J.1998); *Smith v. City of Chester*, 155 F.R.D. 95, 96–97 (E.D.Pa.1994); *Database Am., Inc. v. Bellsouth Advertising & Publishing Corp.*, 825 F.Supp. 1216, 1224 (D.N.J. 1993); *Bermingham v. Sony Corp. of Am., Inc.*, 820 F.Supp. 834, 856 (D.N.J.1992), *aff'd* 37 F.3d 1485 (3d Cir.1994).

---

1. Further, the Court notes that at no time did respondents seek to alert the Court that the March 11, 1998 psychological report was in existence, despite the six months that passed between the issuance of the report and this Court's decision.

The Court therefore finds that where evidence is not newly discovered or there exists no manifest errors of law, the motion for reconsideration must be denied because a motion for reconsideration is not a vehicle to reargue the motion or to present evidence which should have been raised in connection with an earlier motion. *See Database Am.,* 825 F.Supp. at 1220; *Bermingham,* 820 F.Supp. at 856; *Weyerhaeuser Corp. v. Koppers Co., Inc.,* 771 F.Supp. 1406, 1419 (D.Md.1991). "[A] motion for reconsideration should not provide the parties with an opportunity for a second bite at the apple." *In re Christie,* 222 B.R. 64, 66 (D.N.J.1998) (citing *Database Am.,* 825 F.Supp. at 1220). "A party seeking reconsideration must show more than a disagreement with the Court's decision, and 'recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden.'" *Database,* 825 F.Supp. at 1220; *G–69 v. Degnan,* 748 F.Supp. 274, 275 (D.N.J.1990); *see also Elizabethtown Water Co.,* 998 F.Supp. at 459; *Egloff v. New Jersey Air Nat'l Guard,* 684 F.Supp. 1275, 1279 (D.N.J. 1988) (denying motion for reconsideration where plaintiff failed to cite any pertinent case law or fact court may have overlooked). Nor is a motion for reconsideration properly grounded on a request that a court rethink a decision already made. *See Glendon Energy Co. v. Borough of Glendon,* 836 F.Supp. 1109, 1122 (E.D.Pa. 1993).

Similarly, the Court finds that a motion brought under Local Civ. R. 7.1(g) focuses on only those matters, factual or legal, which counsel believes the Court has "overlooked"; thus, this motion will succeed only where "dispositive factual matters or controlling decisions of law" were presented to the Court but not considered. *Damiano v. Sony Music Entertainment, Inc.,* 975 F.Supp. 623 (D.N.J.1996); *Polizzi Meats, Inc. v. Aetna Life & Casualty Co.,* 931 F.Supp. 328, 339 (D.N.J.1996); *Resorts Int'l v. Greate Bay Hotel and Casino,* 830 F.Supp. 826, 831 (D.N.J.1992); *Maldonado v. Lucca,* 636 F.Supp. 621, 630 (D.N.J. 1986). *See also Tischio v. Bontex, Inc.,* 16 F.Supp.2d 511 (D.N.J.1998)("[A party] cannot withhold data or detail in connection with the [original] Motion ..., wait for a decision on that motion and then attempt to dissect the decision and submit information which should have been presented earlier.").

Because a party may not submit evidence on a Motion for Reconsideration which was available to it prior to the issuance of the challenged order, *see Pavlik v. Lane Ltd./Tobacco Exporters Int'l,* 135 F.3d 876 n. 2 (3d Cir.1998), the Court will not consider the psychological report presented under seal in making its determination on the instant reconsideration motion. Nor will the Court consider the Affidavit of Andrew Consovoy which was presented. Such new information was not "newly discovered", and an exercise of due diligence would have put these documents before the Court at the time of its original decision in September of 1998. The Court found in its earlier decision that the Board's determination was arbitrary and irrational and that the Board failed to explain adequately its decision and the reasoning therefore. The new Affidavit and attached psychological evaluation appear to be a classic attempt at a "second bite at the apple" and, as such, will not be considered.

However, because the respondents rightly contend that the Court overlooked controlling decisions of law which hold that the proper remedy in a situation such as this one would have been something other than ordering petitioner's release, *see, e.g., Gambino v. Morris,* 134 F.3d 156 (3d Cir.1998), the Court will

grant the instant motion and will reconsider its September 10, 1998 decision.

The problem now before the Court is fashioning the proper remedy to be applied. The respondents suggest that the remedy at the time of the original decision would have been to remand the case to the Parole Board with directions to set a new FET or to hold a new hearing immediately. Petitioner suggests that the appropriate remedy is reinstatement to parole status. However, since the September 10, 1998 Order of this Court was entered, petitioner received a new parole hearing and parole was denied. Further, the Court is mindful of the petitioner's belief that this case presents a political situation in which official misconduct and retaliation may occur at any time.

Because of the inference of unconstitutional retaliation and in order to assist petitioner in rebutting the psychological evaluation presented by the respondents, this Court appointed counsel to petitioner. Presently, petitioner and his attorney are working to secure an independent psychological evaluation and to discover other materials which could have relevance to the Board's latest decision. Still pending before the Court are several discovery requests made by petitioner, which the parties are attempting to resolve amicably, and a motion by petitioner for a Temporary Restraining Order and/or Preliminary Injunction seeking to prevent the respondents from amending N.J. Admin. Code § 10A:71–3.21(d), which petitioner is challenging as being unconstitutionally vague, until final disposition of this matter. Petitioner has also made a Motion to Vacate the September 15, 1998 Order Granting a Stay of the Writ of Habeas Corpus and for Immediate Release or Enlargement Pending Disposition of Further Proceedings. However, as discussed during a status conference in this matter, because of the sensitive nature of the "danger to the public"

aspect raised by the confidential psychological evaluation in this case, the Court will deny that motion at this time.

In sum, it is this Court's intention to allow this case to proceed under its jurisdiction, perhaps to a hearing, to develop a complete record. Once discovery has been completed, the Court will reconsider its September 10, 1998 Order, as discussed both above and at the May 13, 1999 status conference. Thus, respondents' Motion for Reconsideration will be granted and the case will proceed under the jurisdiction of this Court.

## CONCLUSION

For the reasons set forth above,

IT IS ORDERED on this *10th* day of June, 1999 that the respondents' Motion for Reconsideration is hereby *GRANTED*.

IT IS FURTHER ORDERED that petitioner's Motion to Vacate the September 15, 1998 Order Granting a Stay of the Writ of Habeas Corpus and for Immediate Release or Enlargement Pending Disposition of Further Proceedings is *DENIED*.